Grishelda BRYANT, Plaintiff–Appellant,

v.

John J. MAFFUCCI, Dawn Thackeray, Yvonne Powell, Norwood Jackson and Dr. Edward Allan, Defendants–Appellees.

No. 1435, Docket 90–7220.

United States Court of Appeals, Second Circuit.

Argued June 4, 1990.

Decided Jan. 17, 1991.

Jeff H. Galloway, New York City (Hughes Hubbard & Reed, New York City, of counsel), for plaintiff-appellant.

Carol L. Van Scoyoc, Asst. Westchester County Atty., White Plains, N.Y. (Marilyn J. Slaatten, Westchester County Atty., Kenneth E. Powell, Deputy County Atty., White Plains, N.Y., of counsel), for defendants-appellees.

Before FEINBERG, NEWMAN and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

We consider on this appeal whether administrative delay in scheduling a prisoner's abortion deprived the prisoner of her Fourteenth Amendment right to privacy. Grishelda Bryant sought an abortion while incarcerated in the Westchester Department of Corrections, Womens' Division (Correctional Facility). When it was not timely afforded her, she instituted this action seeking relief pursuant to the civil rights laws, 42 U.S.C. § 1983 (1988), for violation of her Eighth and Fourteenth Amendment rights under the United States Constitution.

She appeals a judgment of the United States District Court for the Southern District of New York (Conner, J.) entered on January 26, 1990, reported at 729 F.Supp. 319 (S.D.N.Y.1990), granting summary judgment in favor of appellees, Westchester Department of Correction Commissioner John J. Maffucci, Senior Assistant Warden Dawn Thackeray, Assistant Warden Yvonne Powell, Warden Norwood Jackson, and Medical Director of Westchester County Medical Center's Correctional Health Services, Dr. Edward Allan, who held their positions at the times relevant to this appeal. From the grant of summary judgment dismissing her claims, appellant has brought this appeal. We affirm.

### FACTS

On July 31, 1985 appellant Grishelda Bryant, also known as Margaret Hewlett, was admitted to the Westchester Correctional Facility. During the booking procedure Bryant informed prison officials she was pregnant and wanted an abortion. The Westchester County Health Facility handles the medical needs of the inmates in the Women's Division, including requests for abortions. The corrections officers in the Westchester Department of Correction are responsible for inmates' security and safety. The same evening as her admission a routine blood chemistry and liver profile was taken which confirmed Bryant's condition. The tests also showed she used drugs including tylenol, cocaine, darvon, opiates, quinine, and methadone.

The next day—August 1—a sonogram was administered to her at the Westchester County Medical Center, the medical arm of the Correctional Facility. The sonogram indicated Bryant was in the 21st week of her pregnancy. This conclusion was based on an abdominal circumference fetal age of 21.9 weeks, a head circumference of 20.4 weeks, and a bi-parietal diameter and femur length fetal age of 21 weeks. Appellant explained to an attending nurse she wished to terminate her pregnancy, and was told to put her request in writing. The attending hospital clinician marked Bryant's medical form "EMERGENCY"

because New York State prohibits abortions beyond the fetal age of 24 weeks. *See* N.Y.Pen.Law § 125.05 (McKinney 1990).

Dr. Allan did not have an office in the Women's Division where Grishelda Bryant was confined. The procedures established in 1985—the relevant time in this litigation—for a woman desiring to terminate her pregnancy was that she make a request to the warden who would transfer it to the medical director's office.

On August 2, 1985 Bryant repeated her request for an abortion to a nurse at the Correctional Facility, who advised her to write to Warden Thackeray and Dr. Allan. In letters appellant wrote that same day to Warden Thackeray and Dr. Allan she requested that her pregnancy be terminated. In both letters she noted that under the circumstances time was of extreme importance and requested the doctor and the warden to respond as soon as possible. Bryant thought she probably stuck the letter addressed to Warden Thackeray under the door to Warden Thackeray's office. The letter to Dr. Allan was given to a nurse to deliver to him.

Appellant testified she made almost daily requests of medical and correctional staff members, including Wardens Thackeray and Powell, to assist in the scheduling of her abortion and made the same requests to the triage nurse, whose August 8, 1985 notes indicate: "Pt requested T.O.P. again. Spoke to Dr. Allan's office. Evidently process is in the works."

Because she received no answer to her first letter, Bryant wrote a second letter about a week later and spoke to Warden Thackeray in a hallway regarding her abortion, but Thackeray told her to see her officer—meaning appellee Assistant Warden Yvonne Powell—about it. Warden Powell testified that she has been in the prison system 23 years and knows her inmates. She stated she has a feel for them and has daily contact, making a tour of the Women's Division at least once a day. She was contacted at least twice by appellant and, in turn, got in touch with the medical unit twice to check on the progress of Bryant's

request. The first time Powell spoke to the medical unit, the response was that "we are checking her out," and the second time, Powell was told an appointment for her abortion had been scheduled.

Warden Thackeray also testified that she was a senior assistant warden in 1985 and was in charge of the operation of the women's facility whose inmates were under her direct care. She stated: "I am responsible for their health and well-being as well as their safety and security. So if anybody has a complaint, I will address it." She confirmed the proper procedure in 1985, but noted that if an inmate had a difficult pregnancy and was experiencing pain, it was considered a medical emergency and the shift supervisor and medical were contacted simultaneously. When medical decided what needed to be done, the shift supervisor made sure it was carried out.

Warden Thackeray remembered Bryant speaking to her on one of her tours in early August 1985. Thackeray checked with the nursing staff and found out they were aware of her request and that staff was in touch with Kings County to set up a pre-abortion physical. Knowing that Bryant was over 12 weeks, in fact 21 weeks, the warden said that this knowledge made her—out of concern for Bryant and her condition—make sure that steps were being taken to ensure that she obtained her abortion. After the warden talked to the medical staff and was assured the process was going forward, she reported this information to Bryant the same day she learned it. When Bryant's mother on August 14 called to express concern, Thackeray said she would check into it—which she did by contacting the nurse while appellant's mother was still on the telephone—and then related to the mother that an appointment was in the process of being made and that if the mother had further concerns she should please contact Dr. Allan, as head of Correctional Health Services. Appellant had daily contact with prenatal care. In fact, as the warden noted, all inmates attempt to have daily contact, if possible, with the medical office.

When Bryant was asked if she personally delivered the August 2 letter to Warden Thackeray she replied: "You know, I'm not really sure. One of the letters I stuck under Warden Thackeray's door." Bryant states that she gave the identical letter to one of the nurses to give to Dr. Allan, and was later told it was given to him. Warden Thackeray admitted that she saw the August 2 letter later, but had no idea where it came from and thinks that she may have seen the one sent over to her office from medical.

According to his testimony and a notation he made on appellant's letter, Dr. Allan received appellant's August 2 letter on August 8 and immediately arranged an appointment for her at Kings County Hospital Center in Brooklyn, New York, where abortions on female inmates more than 12 weeks pregnant were performed. Dr. Allan stated he could not understand why there had been a six-day delay in delivery of appellant's letter to him, and though he looked into it was unable to find an explanation. Dr. Allan also testified that because he knew Bryant was near the legal limit for termination, he told his assistant to tell the Kings County Hospital Center to have Bryant seen early. An appointment was scheduled for August 19, allegedly the earliest appointment available at the hospital.

By memorandum dated August 12, 1985 Dr. Allan advised appellees Jackson and Thackeray that Bryant was in her 22nd week of pregnancy, an abortion had been scheduled at Kings County Hospital Center for August 19, and transportation had been arranged. Warden Powell informed Bryant on August 14 that an appointment for an abortion had been scheduled on August 19.

On August 19 appellant was transported to Kings County Hospital Center where a second sonogram was performed which, as interpreted by Kings County Hospital personnel, indicated that she was 24 weeks pregnant. The hospital therefore refused to terminate the pregnancy. On her return to the Correctional Facility, the Wardens placed Bryant on suicide watch "to make

sure she wouldn't do anything to her [sic] or try to terminate her pregnancy on her own." On November 29 appellant was released to the custody of the New York City Department of Correction at Rikers Island. On December 4, 1985 she gave birth to a child at Elmhurst Hospital.

## PROCEEDINGS BELOW

On October 7, 1985 Bryant commenced the instant civil rights action, 42 U.S.C. § 1983, *pro se* against Commissioner Maffucci, Senior Assistant Warden Thackeray, Assistant Warden Powell, Warden Jackson, and Dr. Allan. After defendants' answer was filed, the New York City law firm of Hughes, Hubbard & Reed, Esqs. was appointed as appellant's counsel. Hughes, Hubbard filed an amended § 1983 complaint claiming that the state defendants both individually and in their official capacities violated Bryant's Eighth Amendment right against cruel and unusual punishment and her Fourteenth Amendment right to privacy. In their answer to the amended complaint, defendants denied these allegations and asserted numerous affirmative defenses, including qualified immunity. After depositions of Bryant and all the defendants, the defendants moved for summary judgment.

The district court reasoned that, in order to state either an Eighth Amendment or privacy claim, Bryant had to adduce evidence that the defendants had acted with deliberate indifference to her medical needs, and concluded that Bryant failed to establish a genuine issue of fact as to whether defendants acted with such indifference. It therefore granted defendants' motion for summary judgment dismissing Bryant's complaint.

## DISCUSSION

### I. Standard of Review

#### A. *Summary Judgment*

In resolving the issues raised on this appeal, we turn first to the standard of review. The rules relating to disposition of appeals from grants of summary judgment are familiar, and need be stated only briefly. On appeal from a grant of summary judgment we review the record *de novo* to determine whether there are genuine issues of material fact requiring a trial. *Burtnieks v. City of New York*, 716 F.2d 982, 985 (2d Cir.1983); Fed.R.Civ.P. 56(c). In assessing the record, all ambiguities and reasonable inferences are viewed in a light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam). Summary judgment is appropriately granted when there is no genuine issue as to any material fact and when, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper. *See id.* at 250–51, 106 S.Ct. at 2511–12. Once the movant has established a *prima facie* case demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a "metaphysical doubt" concerning the facts, *see Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), or on the basis of conjecture or surmise.

### II. Constitutional Standards

To state a viable § 1983 claim, plaintiff must show that officials were acting under color of state law and their actions deprived the plaintiff of a right guaranteed by the constitution or laws of the United States.[1] *See Parratt v. Taylor*, 451 U.S.

---

**1.** Section 1983 provides, in pertinent part:

"Every person who, under color of any stat-

527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1980). An allegation of a wrong perhaps sufficient to state a remediable tort cause of action under state law does not automatically rise to the level of a constitutional deprivation simply because a defendant is the state or an agent of the state. *Daniels v. Williams*, 474 U.S. 327, 333, 106 S.Ct. 662, 666, 88 L.Ed.2d 662 (1986) (due process protections are not triggered by lack of due care by state officials); *Davidson v. Cannon*, 474 U.S. 344, 347–48, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986) (although negligence of prison official led to prisoner's serious injury, constitution requires no procedure to compensate injury arising from negligence); *Estelle v. Gamble*, 429 U.S. 97, 105–06, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

## A. *Eighth Amendment Claim*

Bryant alleges that the defendants' actions deprived her of her Eighth Amendment right to be free from cruel and unusual punishment and of her constitutional right to privacy. The district court accepted the framing of the first issue as an Eighth Amendment claim, and applied the deliberate indifference standard applicable to § 1983 claims brought by convicted inmates. *See Estelle*, 429 U.S. at 105, 97 S.Ct. at 291–92.

At the time of her August 1985 incarceration appellant was not an inmate, but rather a pretrial detainee, whose constitutional claims are properly analyzed under the Due Process Clause of the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979); *Ingraham v. Wright*, 430 U.S. 651, 671 & n. 40, 97 S.Ct. 1401, 1412 & n. 40, 51 L.Ed.2d 711 (1977). Although a pretrial detainee's due process rights to adequate medical treatment are at

least as great as the Eighth Amendment protections available to prison inmates, *see Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983), the Supreme Court has left unresolved what standard applies. It remains unsettled, in other words, whether a pretrial detainee must meet the "deliberate indifference" standard of *Estelle* or show "gross negligence" or "recklessness" or prove conduct not amounting to intentional acts, but that is more than simple negligence to state a claim of a constitutional deprivation under the Due Process Clause. *See Daniels*, 474 U.S. at 334 n. 3, 106 S.Ct. at 666 n. 3 (refusing to consider whether "something less than intentional conduct, such as recklessness or 'gross negligence,' is enough to trigger the protections of the Due Process Clause"); *cf. City of Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 1204 n. 8, 103 L.Ed.2d 412 (1989) (noting that question remains unresolved).

## B. *Fourteenth Amendment Claims*

■ The district court also ruled that *Estelle*'s deliberate indifference standard applied to privacy claims under the Fourteenth Amendment's Due Process Clause. While it is true that we applied a deliberate indifference standard to a § 1983 claim when a state agency placed a foster child in an abusive foster home, *Doe v. Dept. of Soc. Servs.*, 649 F.2d 134, 143 (2d Cir.1981) (noting that gross negligence and deliberate indifference though not coextensive are closely related), our research has found no federal court ruling on what standard is to be applied to the denial of the right to terminate an incarcerated detainee's pregnancy.

Although the issue is therefore one of first impression, it is one that we need not fully decide. The Supreme Court has made clear that it has enunciated *no* general standard regarding due process claims

ute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immuni-

ties secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."
42 U.S.C. § 1983 (1988).

against defendants in their individual capacities under § 1983, except that mere negligence is insufficient to state a viable claim. *See City of Canton,* 109 S.Ct. at 1204 n. 8 ("this Court has never determined what degree of culpability must be shown before the particular constitutional deprivation asserted in this case—denial of the due process right to medical care while in detention—is established."). The conclusion that negligence alone does not establish a privacy claim is drawn from the Supreme Court's consistent rulings that negligence will not support a claim under the Due Process Clause. *See Daniels,* 474 U.S. at 333–34, 106 S.Ct. at 666–67; *Davidson,* 474 U.S. at 347–48, 106 S.Ct. at 670–71; *cf. Estelle,* 429 U.S. at 105–06, 97 S.Ct. at 291–92. Thus, whatever degree of negligence must be shown to state a valid due process claim for the state's failure to afford a pretrial detainee a requested abortion to which she is entitled under the law, as Bryant is here, it is plain that simple negligence is not enough.

Therefore, resolution of the issue presented, i.e., establishing a standard of culpability, is not required in order to decide the present appeal because whatever test must be met to fix individual liability for the deprivation of a due process right under § 1983, proving that appellees were negligent will not establish Bryant's due process deprivation claim, *see Daniels,* 474 U.S. at 328, 106 S.Ct. at 663; *Davidson,* 474 U.S. at 347, 106 S.Ct. at 670. Here appellant has failed, as a matter of law, to adduce sufficient evidence to permit a jury to find that the defendants' actions were more than merely negligent.

### III. Application of Due Process Standard

The district court assessed the evidence against each defendant and group of defendants individually. Because the principles regarding supervisory liability under § 1983 that it stated when marshalling the evidence were correct, we need not repeat its analysis. Obviously, if defendants Allan, Powell, and Thackeray cannot be held liable for their conduct because it was at most negligent, it follows logically that de-

fendants Maffucci and Jackson, who are only implicated because of their supervisory authority over the practices and procedures followed at the prison, also are not subject to being held liable.

We recognize that the existence or the degree of negligence developed by the facts of a case ordinarily present a question of fact for the jury. *See Hathaway v. Coughlin,* 841 F.2d 48, 50–51 (2d Cir.1988); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir. 1987); *Archer v. Dutcher,* 733 F.2d 14, 17 (2d Cir.1984); *West v. Keve,* 571 F.2d 158, 162 (3rd Cir.1978). But when the facts, viewed in the light most favorable to the moving party, fail to state a legal claim under applicable law, summary judgment dismissing the claim is appropriate. *See Estelle,* 429 U.S. at 107, 97 S.Ct. at 292–93 (finding that even construing complaint liberally, defendants' actions were at most a claim for medical malpractice).

Examining the evidence in this record, appellant presented proof of two incidents that might theoretically impose liability on defendants Powell, Thackeray, and Allan. The first is the six-day delay in delivery of appellant's letter to Dr. Allan; the second is the scheduling of appellant's abortion for August 19. Bryant contends that Dr. Allan did not act on her letter until August 8, and that he either received the letter several days before August 8 and delayed acting on it, or he received the letter on August 8 and scheduled the abortion after the expiration of the legal time limit for such procedure. In either event, appellant believes she is entitled to a credibility determination by a jury with respect to the doctor's testimony. The evidence reveals an August 8 notation of receipt on appellant's letter, and Bryant has produced no proof to suggest that Dr. Allan in fact received the letter before that date. Resolution of the doctor's credibility is not called for by appellant's conjectures as to what she thinks may have happened.

Although the delay remains unexplained, appellant has not adduced any proof that it was the result of anything more than simple negligence. Moreover, while a mail service that cannot deliver a letter from

one part to another part of the same facility in less than six days is inefficient, to say the least, the effect of the delay did not then deprive appellant of her rights.

It is true that there is a four-week error in estimating gestational age. But that error, referred to by the Supreme Court in *Webster v. Reproductive Health Services*, 492 U.S. 490, 109 S.Ct. 3040, 3055, 106 L.Ed.2d 410 (1989), relates to a woman's estimate of when gestation began, which is concededly unreliable. Here, of course, the estimate was based on a medically approved sonogram test administered upon appellant's first day in jail, indicating a 21–week–old fetus. On August 8, Dr. Allan was therefore still able to schedule an appointment within what he believed was the legal time limit for appellant's termination of her pregnancy. Appellant does not contest that—assuming the first sonogram correctly placed appellant's pregnancy in the twenty-first week—the August 19 appointment was within the legal period within which appellant could obtain an abortion. Dr. Allan was entitled to rely on the sonogram. Even though his reliance is now known to have been misplaced, no proof in the record indicates that appellees had any reason not to rely on the first sonogram. That it later proved inaccurate is most unfortunate, but the harm that appellant now claims resulted does not change the fact that a misdiagnosis of her condition made—insofar as this record shows—in good faith cannot be more than mere negligence.

Further, Bryant has not alleged that appellees attempted to delay her access to an abortion. Nor could she since the testimony of Senior Warden Dawn Thackeray and Assistant Warden Yvonne Powell reveals their concerns for appellant's medical situation and their efforts to have the medical office promptly help her. She was given a sonogram within one day of her arrival at the Correctional Facility, and once Dr. Allan received her request for an abortion, it was scheduled immediately at a time believed to be the earliest available date. To state a viable § 1983 claim, Bryant needed to allege an underlying violation of her due process rights, that is to say, something more than a negligent deprivation of her life, liberty or property by these state defendants.

■ Even though the delay and the date for scheduling the hospital appointment issues were not tried, it was unnecessary to submit them to a jury because they presented no issues of material fact within the meaning of Rule 56. *See United States v. One Tintoretto Painting*, 691 F.2d 603 (2d Cir.1983). We recognize caution must be exercised in granting summary judgment where state of mind is at issue, as here, *see Quarles v. General Motors Corporation*, 758 F.2d 839, 840 (2d Cir.1985). But here there was full discovery of all the defendants. Despite that gathering of the pertinent facts, no proof has been proffered by appellant that would tend to show more than a negligent deprivation of her due process rights.

The dissent says a jury could reasonably find that appellees Allan, Thackeray and Powell were reckless in their disregard of appellant's rights. Gross negligence or reckless conduct generally imports the concept of heedless indifference to consequences to another. Leading commentators define this kind of conduct as where defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk. Restatement, *Torts* 2d, § 500, Comment a (1965). W.L. Prosser, *Law of Torts* § 34, p. 187 (4th ed. 1971). For a jury to find the three appellees acted in conscious disregard or indifference to appellant's situation—in light of all the testimony in this record—it would have to reach those conclusions solely on its own conjecture or surmise. Since proof of recklessness or any other form of aggravated negligence is utterly lacking, a reasonable jury, as a matter of law, could not find appellees had violated appellant's right to privacy under the Fourteenth Amendment. Hence, the § 1983 claim was properly dismissed by the grant of summary judgment.

## IV. Suit Against Defendants in their Official Capacities

In bringing suit against defendants in their official capacities, Bryant has effectively brought suit against the governmental unit that employs them, Westchester County. *Monell v. Department of Social Services*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978). She must show the deprivation of her rights was caused by a policy that was deliberately indifferent to those rights. *See City of Canton*, 489 U.S. 378, 109 S.Ct. 1197 (dismissing detainee's § 1983 claim against city for failure to properly train police because plaintiff's claim failed to meet deliberate indifference standard); *Monell*, 436 U.S. at 690–91, 98 S.Ct. at 2035–36 (no municipal liability under § 1983 on a *respondeat superior* theory). And, further she must demonstrate that the county made some deliberate choice, implemented through policy or custom, which is the "moving force [behind] the constitutional violation." *City of Canton*, 109 S.Ct. at 1204–05; *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981).

In order to sustain this claim, more must be shown than a single incident in which a plaintiff was denied a constitutional right. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985); *see also Todaro v. Ward*, 565 F.2d 48, 53 (2d Cir.1977). Here the district court outlined the Facility's procedure for pregnant females:

> As a routine procedure, pregnant female inmates were given sonograms ... shortly after entering the Facility.... If a pregnant inmate, during the time of plaintiff's incarceration, wished to obtain an abortion while incarcerated at the [Facility], she had to make a formal request in writing to Dr. Allan and Warden Thackeray in accordance with the procedure to request medical care or the request could be made on a separate piece of paper and given to the nursing staff or directly to Dr. Allan....
>
> Once a request was received, an examination to determine the gestation period

> would be conducted to determine where the abortion was to be performed.... [T]he abortion would be paid for by the Westchester Department of Correction....
>
> No permission from the Department of Correction was needed for an inmate to receive an abortion.... The Department of Correction provided the safe and secure transportation of the inmate to and from the facility where the abortion was to be performed.

729 F.Supp. at 326–27.

The district court found this procedure "did not evidence deliberate indifference to plaintiff's constitutional rights" and "[e]ven if there were an error in the chain that led to the denial of plaintiff's abortion, it was an isolated instance which does not rise to the level of a constitutional violation." *Id.* at 327. We agree. Because the Facility's stated procedure did not require pregnant inmates to receive permission either from the Department of Correction or from a court to obtain a nontherapeutic abortion, it is distinguishable from the procedure found violative of § 1983 in *Monmouth County Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3rd Cir.), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1987).

In the case at bar there is no evidence of any similar incident at the Facility, and it appears from the uncontested facts that the normal procedure guarantees female inmates at the correctional facility their right to choose to terminate their pregnancies. The hardship appellant experienced was an isolated incident that may well have denied her due care while incarcerated, but did not deny her right to due process.

## CONCLUSION

For the reasons stated the judgment of the district court is affirmed.

JON O. NEWMAN, Circuit Judge, dissenting:

As this case came to us, it concerned a pregnant woman's right to an abortion. As it leaves us, that woman—a pretrial detainee in a county jail—has not only been

denied an abortion, she has also been denied her right to a jury trial to determine whether the action of county jail officials in failing to honor her request for an abortion was so arbitrary as to be unconstitutional. From the affirmance of a summary judgment in favor of the jail officials, I respectfully dissent.

As the majority recognizes, plaintiff's case consists of at least the following factual allegations:

1. On the very first day that Grishelda Bryant was locked up in the Westchester Correctional Facility, July 31, 1985, she told officials that she was pregnant and wanted an abortion.

2. That same day, her pregnancy was confirmed by routine tests.

3. One day later, August 1, a sonogram averaging three fetal measurements estimated the age of the fetus at 21 weeks, and one measurement placed the age at 21.9 weeks. Bryant's medical form at the hospital where the sonogram was performed was marked "EMERGENCY".

4. On that second day, Bryant repeated her request for an abortion and was told to put her request in writing.

5. On the third day, August 2, Bryant repeated her request for an abortion and wrote letters to Senior Assistant Warden Dawn Thackery and Dr. Edward Allen, Medical Director of the County's Correctional Health Services.

6. Thereafter, Bryant made almost daily requests for an abortion to jail staff members, including Warden Thackery and Assistant Warden Yvonne Powell.

7. On one occasion, Bryant spoke to Warden Thackery in a hallway about her request and was told to see Warden Powell.

8. Dr. Allen received Bryant's written request on the ninth day of her confinement, August 8.

9. On that day, Dr. Allen told his assistant to schedule an early appointment for Bryant at Kings County Hospital Center.

10. An appointment was scheduled for the 20th day of Bryant's confinement, August 19.

11. On that day, a second sonogram indicated a fetal age of 24 weeks, beyond the limit of permitted abortions in New York. *See* N.Y.Pen.Law § 125.05 (McKinney 1987).

12. No abortion was performed, and Bryant gave birth to a child.

Though recognizing that on the jail officials' motion for summary judgment all reasonable inferences must be drawn in Bryant's favor, the majority nonetheless concludes that the only finding a jury could reasonably make is that Bryant's denial of an abortion resulted only from simple negligence on the part of prison officials.

I think it is clear that a jury could reasonably find that prison officials were reckless in their disregard of Bryant's rights. In the first place, it was reckless for prison officials not to act on the second day of her confinement to arrange for a prompt abortion. The sonogram taken that day indicated a fetus of probably 21 weeks, and one measurement placed the age at nearly 22 weeks. The same considerations that prompted the "EMERGENCY" marking on Bryant's medical form, no doubt influenced by the inevitable risk of some error in all medical measurements, could reasonably be found to require immediate scheduling of an abortion so that it could be performed safely within the State's 24-week limit.

A jury could reasonably find that it was reckless not to schedule the abortion immediately and secure Bryant's written request in the day or two that would inevitably intervene between the scheduling and the abortion.

A jury could reasonably find that Warden Thackery acted recklessly in shunting Bryant aside to deal with Warden Powell. Though a warden need not respond to all inmate grievances in hallway conversations, the request of a woman then thought to be 22 weeks pregnant for an abortion is not a minor quarrel about trivial conditions like the quality of prison food.

A jury could reasonably find that it was reckless for prison officials not to schedule an abortion during the interval between August 1 and August 8, during which Bryant repeatedly requested an abortion.

A jury could reasonably find that it was reckless for Dr. Allen to accept whatever scheduling date the Kings County Hospital Center could give to his assistant.

A jury could reasonably find that it was reckless for all of the jail officials to accept the August 19 appointment date, a date that already placed Bryant well into her 24th week if the 21.9 week measurement taken on August 1 turned out to be correct, as it did.

A jury could reasonably find that it was reckless for the jail officials not to make inquiry of other metropolitan hospitals to see if an earlier appointment could be scheduled. It is a reasonable inference that somewhere in the New York metropolitan area, an abortion could have been promptly scheduled.

The Supreme Court has recognized that "time is likely to be of the essence in an abortion decision." *H.L. v. Matheson*, 450 U.S. 398, 412, 101 S.Ct. 1164, 1172, 67 L.Ed.2d 388 (1981). In disregard of that obvious truth, the majority treats the 20-day delay in this case as no more than simple negligence. The six-day delay in delivering Bryant's written communications within the jail is viewed as merely "inefficient." Yet Bryant was repeatedly renewing her request for an abortion with personal pleas during that interval and prison officials were failing to act. The claim is not about slow delivery of prison mail; it is about reckless disregard of a woman's repeated request to exercise a constitutional right. The officials' acceptance of the eventual August 19 date is characterized by the majority as the permissible reliance on an unfortunate misdiagnosis. Perhaps a jury, properly instructed, could draw that inference, but it is surely not the only reasonable way to assess what occurred. Just as reasonable—more so, in my view—is the inference that with a diagnostic technique known to be inexact and with one measurement of that technique already placing the August 19 date beyond the State's 24-week limit, it was plainly reckless not to call other area hospitals and arrange for an abortion on a date that was in fact the earliest possible date when the abortion could have been performed, not just a date that Dr. Allen can be said to have believed was the earliest date available at the one hospital where inquiry was made.

Grishelda Bryant was within the total control of government officials. Had she not been confined for lack of bail, she might have preferred to have her baby. Once incarcerated for lack of bail, she was entitled to exercise her constitutional right to choose an abortion. County officials delayed the exercise of that right, and their delay resulted in the denial of that right. Under the facts of this case, it is for a jury, not this Court, to decide whether the officials' conduct reached that degree of arbitrariness that establishes a compensable constitutional injury.

In the District Court, Bryant's claim was rejected because the District Judge applied to her substantive due process claim of denial of an abortion the "deliberate indifference" standard appropriate to an Eighth Amendment claim for inadequate medical care in prison. *See Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). In this Court, the majority does not embrace the District Court's reasoning, apparently recognizing that the "deliberate indifference" standard applicable to prisoners' medical claims is too rigorous a standard to be applied to the claim of a pregnant prisoner asserting her constitutional right to an abortion. *See Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988) (recognizing that prison officials violate a prisoner's right to an abortion by interposing roadblocks not justified by their reasonable relation to legitimate penological interests).

Nevertheless, the majority concludes that Bryant's claim was properly rejected because in its view the delay in arranging for an abortion was nothing more than

simple negligence. That conclusion denies Bryant not only her right to an abortion but also her right to a jury trial. Bryant requested an abortion on the first day of her confinement. On the second day of her confinement, with a sonogram indicating that she was very close to the time limit beyond which New York prohibits abortions, her condition was serious enough to be labeled "EMERGENCY" by hospital staff. Yet prison officials did not schedule an abortion until the 20th day of her confinement, which placed her beyond New York's time limit. I think a jury would say that these officials were not simply negligent. I think a jury would say, "These officials didn't give a damn."

Of course, the issue is not what I think a jury would say. It is whether the facts and circumstances presented by the prisoner, with all reasonable inferences drawn in her favor, are sufficient to send her case to a jury. In declining to do so, the majority fully credits the protestations of prison officials as to their concern for Grishelda Bryant. I do not know how a jury would assess the testimony of these officials. I am satisfied, however, that under all the circumstances, especially the totally inexcusable failure to make inquiry as to whether some other hospital in the area could perform an abortion promptly, a jury could reasonably conclude that their expressions of concern are suspect and could reasonably decide this case in plaintiff's favor. At a minimum, Grishelda Bryant has a right to find out what a jury's verdict would be.

I dissent.