Murat HOT, individually, and as Administrator of the Estate of Vahidin Hot and Sevdija Hot, individually and as Administratrix of the Estate of Vahidin Hot, Plaintiffs,

v.

CARMEL CENTRAL SCHOOL DISTRICT and The County of Putnam, Defendants.

No. 96 Civ. 4764 (BDP).

United States District Court, S.D. New York.

Feb. 11, 1998.

Jonathan Lovett, Lovett & Gould, White Plains, NY, for Plaintiffs.

John T. Brennan, Henderson & Brennan, White Plains, NY, for Defendant Carmel Cent. School Dist.

Daniel A. Seymour, Servino & Seymour, White Plains, NY, for Defendant County of Putnam.

## MEMORANDUM DECISION AND ORDER

PARKER, District Judge.

### INTRODUCTION

This case arises from events that culminated in the tragic death of Vahidin Hot, an 18 year old high school student. Hot's parents, Murat and Sevdija Hot, assert claims pursuant to 42 U.S.C. § 1983 and state law, against the Carmel Central School District (the "District") and the County of Putnam (the "County") alleging, in essence, that de-

fendants' failure adequately to train their personnel caused their son's death.

Both defendants have moved for summary judgment. For the reasons that follow, the defendants' motions are granted as to all federal law claims. This Court declines to exercise jurisdiction over the remaining state law claims.

## BACKGROUND

On a motion for summary judgment, "[a]s a general matter, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988). Accordingly, the following facts are construed in a light most favorable to the plaintiffs.

On February 16, 1995 at approximately 4:30 a.m., an anguished and distraught Vahidin Hot called the home of Vincenza Argese, a Monitor at Carmel High School. Until approximately 6 a.m. Hot discussed with Argese problems in his relationship with his girlfriend, Kathleen Conroy, whom he suspected of having had intimate relations with another student, Brian Flandreau. During this conversation Hot told Argese that he had considered killing Kathleen Conroy and Flandreau and then himself.

After this conversation, Argese, believing that Hot might resort to violence, unsuccessfully called Carmel High School seeking assistance. She then called the home of the school's Assistant Principal, Steve Borrello, and told him about her conversation with Hot. At approximately 8 a.m. Borrello called the Putnam County Sheriff's Department and relayed the information he had received from Argese. Neither Argese nor Borrello attempted to contact Hot's parents.

Sheriff's Department deputies Nicholas DePerno and James Bambino were dispatched to the Hot residence to locate Vahidin. Vahidin was not at home and his family did not know where he was. Hot's brother stated that Hot returned home at approximately 4 a.m. but then left. The deputies then returned to the Sheriff's Department, where Sergeant MacCrae telephoned John Conroy, Kathleen Conroy's father, to inform him that Hot had threatened his daughter's life. Deputies DePerno and Bambino were then dispatched to the Conroy residence in another attempt to locate Hot.

At approximately 9 a.m. the Sheriff's Department was notified that a neighbor had seen Hot's unattended vehicle parked a quarter mile from the Conroy residence. Deputies DePerno and Bambino checked the vehicle and then went to the Conroy residence. When the deputies arrived at the house they spoke with John Conroy and conducted a limited search for Hot before returning to the vehicle. Thereafter, other members of the Sheriff's Department, including Investigator William Quick and Sergeant Douglas MacCrae, arrived at the location of Hot's car.

While the officers remained at the car, Vahidin Hot approached the Conroy home wearing a bullet proof vest, brandishing a semi-automatic handgun, and carrying 26 rounds of ammunition. After entering the house, Hot demanded to speak with Kathleen and then pointed the gun at her father. While refusing to let Hot see Kathleen, Conroy, a retired police officer, backed Hot out of the house onto the front steps. Hot then fired a shot in the air. Regina Conroy, Kathleen's mother, quickly shut the front door, leaving Hot outside. Hot fired his gun at the door and at Kathleen's second floor bedroom window.

Having heard shots, members of the Sheriff's Department returned to the Conroy residence, where they observed Hot in front of the house. After identifying themselves as police officers, one of them yelled for Hot to "drop the gun." Hot appeared undecided about what to do, and moved nervously back and forth. Hot then moved to the side of the house. Investigator Quick gave chase, while yelling for Hot to drop his gun.

At the rear of the house, Quick observed Hot attempting to enter through a rear door. When Quick yelled for Hot to drop the gun, Hot turned toward him and pointed the gun in Quick's direction. Quick fired one shot at Hot, which missed. Hot then discharged his gun into the rear door of the house. At that point Quick fired a series of shots at Hot, at

least one of which struck him. Hot was pronounced dead at approximately 10 a.m.

In the days prior to Hot's death, there had been signs that the youth was deeply troubled and contemplating violence and death. During the early morning hours of February 16, prior to his call to Argese, Hot had repeatedly phoned Kathleen but was not allowed to speak to her, and had phoned Brian Flandreau and threatened to kill him after asking if he had slept with Kathleen.

During the week prior to his death, Hot appeared alternately despondent and angry, spoke to Argese about his problems with Kathleen, and told Argese that he contemplated assaulting Flandreau. When Argese told Hot that he should talk to the school psychologist or his guidance counselor, Hot said that he wanted to talk only to her. Argese did not take any further steps to obtain professional help for Hot.

Hot's disturbed condition was also apparent to his Spanish teacher, Linda Forman. A week or so before his death, Hot wrote a journal entry for Spanish class that expressed his anger, alluded to his troubled relationship with Kathleen and intimated that he was thinking about death and stalking Kathleen. Forman was concerned about the journal entry and notified Borrello. Forman did not discuss the journal entry with the school psychologist or a guidance counselor.

A few months prior to Hot's death, the owner of a pharmacy where Hot worked reported to the Sheriff's Department that a gun had been stolen from the premises and that he believed that Hot was responsible. Both District personnel and members of the Sheriff's Department were informed of the theft and of the pharmacy owner's suspicions.

Finally, District personnel, including Borrello, Forman, and Argese, knew that Hot had a history of difficulties with girls and had exhibited a pattern of obsessive, controlling behavior. Several parents, including Kathleen's, had complained about Hot to the District and to the Sheriff's Department. In fact, John Conroy had previously filed an aggravated harassment charge against Hot.

In June 1996 plaintiffs commenced this action asserting both federal and state law claims against the County and the District. Plaintiffs contend that the failure of the County and the District to train their personnel for a situation such as the one presented by Hot's behavior resulted in his death and thereby deprived both Hot and his parents of their rights under the Fourteenth Amendment of the United States Constitution and Article I of the New York State Constitution. Additionally, plaintiffs allege that both the County and the District acted in a negligent or reckless manner that led to Hot's death. The defendants have moved for summary judgment on all claims.

## DISCUSSION

A motion for summary judgment should only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Hayes v. New York City Dep't. of Corrections,* 84 F.3d 614, 619 (2d Cir.1996); *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). The court's responsibility is to perform "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *McNeil v. Aguilos,* 831 F.Supp. 1079, 1082 (S.D.N.Y.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *Hayes,* 84 F.3d at 619.

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities in the light most favorable to, and draw all reasonable inferences in favor of, the party opposing the motion. *Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 382 (2d Cir.1996); *In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir. 1996). The Court must not weigh evidence or assess the credibility of potential witnesses, for such evaluations are to be conducted solely by the jury. *Hayes,* 84 F.3d at

619; *United States v. Rem,* 38 F.3d 634, 644 (2d Cir.1994); *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). A finding of disputed material facts that could reasonably be resolved in favor of either party precludes summary judgement. *Wernick,* 91 F.3d at 382 (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 250).

Generally, the burden is on the moving party to demonstrate that there is no genuine dispute respecting any material fact and that he is entitled to judgment as a matter of law. *In re State Police Litigation,* 88 F.3d at 123; *Gallo v. Prudential Residential Services, Limited Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994). To oppose successfully a motion for summary judgement, the responding party "must set forth facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

Before either the County or the District may be held liable for Hot's death on a failure to train theory under § 1983, plaintiffs must show that District or County personnel engaged in wrongful conduct that resulted in Hot's death, and that the wrongful conduct stemmed from a failure to train that reflected a "deliberate indifference" to constitutional rights. *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

The deliberate indifference standard is a high one, requiring that "policymakers made a deliberate choice ... from among various alternatives not to fully train employees." *Walker v. City of New York,* 974 F.2d 293, 297 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 389 (internal quotations omitted)). Three requirements must be met before a failure to train will constitute deliberate indifference. *Id.* First, the plaintiff must show that the policymaker chose not to train its personnel for a circumstance that the policymaker knows to a moral certainty will arise. *Walker,* 974 F.2d at 297. Failure to train for rare or unforeseen events will not support a finding of deliberate indifference. Second, the plaintiff must show the circumstance to be one that proper training would enable the employee to handle more skillfully. *Id.* Third, the plaintiff must show that an employee's improper handling of the anticipated situation will "frequently cause the deprivation of a citizen's constitutional rights." *Id.*

The plaintiffs generally contend that District and County employees acted improperly and that Hot's death could have been avoided. Specifically, plaintiffs assert that District personnel did not appropriately respond to indications that Hot was experiencing serious emotional difficulties that might cause him to act violently. For example, although Forman, Hot's Spanish teacher, talked with Hot after she read his disturbing diary entry and notified Borrello, she did not contact any other District official or Hot's parents. Similarly, neither Argese nor Borrello, who were well aware of Hot's depression and his pattern of obsessive behavior, insisted that he receive professional counseling.

With respect to the County, plaintiffs claim that members of the Sheriff's Department did not appropriately respond to information that Hot intended to kill Kathleen Conroy, Brian Flandreau and then himself. Plaintiffs argue, for example, that members of the Sheriff's Department, who knew of Hot's stated intentions and that he likely possessed a gun, should not have remained with Hot's car, but rather should have stayed at the Conroy residence or taken the family from their home in order to avoid a confrontation. Additionally, plaintiffs assert that Sheriff's Department officers should have done more to dissuade Hot from using the gun.

On this motion, the Court need not decide, and does not decide, whether either District or Sheriff's Department personnel acted improperly during the events that resulted in Hot's death. Assuming, *arguendo,* that plaintiffs are correct that, in hindsight, employees of the defendants may have acted more appropriately in some way or another, plaintiffs have not linked the allegedly inappropriate responses to a failure to train that reflects deliberate indifference to constitutional rights.

The circumstances surrounding Hot's death are highly anomalous, no proper showing having been made that they were ever previously encountered by either the Sheriff's Department or the District. Neither a

police department nor a school district can be expected to provide training directly applicable to the unpredictable conduct of an individual who was highly irrational, highly dangerous to others, and self-destructive. Defendants cannot be said to have known to a "moral certainty" that the complex series of circumstances leading to Hot's death would arise.[1] A failure to train only evidences deliberate indifference when it is obvious that particular violations of constitutional rights would be likely to occur without more training. *Board of County Commissioners of Bryan County, Oklahoma, v. Brown*, 520 U.S. 397, ——, 117 S.Ct. 1382, 1390, 137 L.Ed.2d 626 (1997); *Canton*, 489 U.S. at 389. Members of the Sheriff's Department had received training applicable to a variety of situations involving the use of deadly force and the apprehension of armed suspects. District personnel were aware that students who seem usually troubled should be referred to the school psychologist or to the student's guidance counselor, and indeed, in the past, such referrals had been made and accepted by students.

Because the circumstances leading to Hot's death were so bizarre and unforeseeable, defendants cannot reasonably be charged with anticipating them, and certainly cannot be charged with having anticipated them to the requisite "moral certainty." Since defendants made no conscious choice not to train for events that they were morally certain would occur, they were not deliberately indifferent to any constitutional right enjoyed by Hot. *See Bryan County*, 117 S.Ct. at 1390.

## CONCLUSION

For the reasons stated, defendants' motions for summary judgment are granted. The Court declines to exercise jurisdiction over plaintiffs' pendent state law claims. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d

218 (1966). Accordingly, plaintiffs' state law claims are dismissed without prejudice.

**SO ORDERED:**

---

[1] Furthermore, it is unlikely that additional training would have led to a different outcome. Vahidin Hot was deeply troubled. District personnel unsuccessfully attempted to help him. Hot could have sought additional help, and was urged to do so. Members of the Sheriff's Department were justified in using deadly force since Hot was directly threatening others and had ignored repeated requests to drop his gun. In sum, plaintiffs' assertion that improved training would have averted Hot's death is highly speculative.