Martin VANDEL, Plaintiff,

v.

STANDARD MOTOR PRODUCTS,
INC. Defendant.

No. 3:96–CV–01295 (WWE).

United States District Court,
D. Connecticut.

May 3, 1999.

Peter A. Kelly, New Haven, CT, for Plaintiff.

Michael P. Kaelin, Leanne E. Murray, Kelly Drye & Warren, Stamford, CT, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

EGINTON, Senior District Judge.

### INTRODUCTION

Plaintiff Martin . Vandel ("Vandel") brings this litigation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sections 2000e *et seq.* (Title VII) and the Age Discrimination in Employment Act, 29

U.S.C. Sections 621 *et seq.* ("ADEA"). Vandel asserts that he was terminated from his employment at defendant Standard Motors Products, Inc. ("Standard") due to his national origin (Polish) and because of his age (forty-seven). Defendant has moved for summary judgment on both these claims.

## STATEMENT OF FACTS

The Court summarizes only those facts deemed necessary to an understanding of the issues raised by, and decision rendered on, this Motion.

Vandel was hired by Standard in 1988, at the age of thirty-eight, to work in its EIS Brake Parts Division ("EIS"). It is Standard's position that Plaintiff's overall performance, in particular his interpersonal skills, while in this position did not meet Standard's expectations. Four different supervisors over a period of three years had documented problems with Vandel's interpersonal skills. After numerous written and verbal warnings and counselings regarding his troubling interpersonal skills, Vandel was allegedly discharged due to his failure to get along with his supervisors, his refusal to respect their authority, and his inability to work as a team member, which was of great import to the assignments given EIS. According to Standard, Vandel was "simply unmanageable".

In or around 1992, EIS transferred its business/plant from Middletown to Berlin. At that time, Vandel reported to one Mr. Genovese and one Mr. Gordon. It is documented by affidavit that it was at this time Vandel's supervisors began to experience increasing difficulties managing Vandel. One of the most serious problems with Vandel's job performance centered on his inability to interact on a professional level with other staff at EIS, as well as well as his supervisors, Genovese and Gordon, Eric McAlexander, the plant manager, and ultimately one John Wolf.

In October, 1992, Genovese documented these problems in a memorandum to Vandel. In that memorandum, Genovese indicated that Vandel's

> attitude and cooperation have been far removed from the team effort that is so essential in maintaining consistency in our manufacturing process which is ultimately the responsibility of everyone in manufacturing support.

Specifically, Genovese noted that Vandel resisted the performance of any tasks he deemed "menial", failed to respect authority, and established and worked on his own schedule. Genovese warned Vandel that if his "attitude and cooperation does not improve *immediately,* my only course of action will be a request of termination." This memorandum, giving Vandel written warning as of October, 1992, of the seriousness of his interpersonal problems and the incumbent ramifications of this attitude, was also sent to McAlexander and one John Geoffrion, EIS's personnel manager in Berlin.

In or about late 1993, at a meeting for a certain project, Vandel declared that Genovese was not his supervisor on this project and that Genovese was not intelligent enough to provide him with direction.

Shortly thereafter, Genovese informed McAlexander of this incident. In a letter to McAlexander detailing the incident, Genovese requested assistance and support in dealing with Vandel. According to Genovese, Vandel had alienated himself from the other designers and toolmakers, and the problem needed to be addressed immediately.

In April, 1993, Vandel's inability to interact with his colleagues was documented in his 1992/1993 performance evaluation, prepared by Genovese. The 1992 evaluation indicates that Vandel's technical skills were of a high caliber and that Vandel's technical skills or professional knowledge had never been questioned. The 1992 Evaluation ranks Vandel as "adequate" with respect to the categories of human relations/communications, leadership, cooperation with other departments. "Ade-

quate" is the second lowest of the five possible ratings on the evaluation.

Vandel refused to sign this evaluation, and requested that it be re-done by Gordon or McAlexander.[1]

Both Gordon's and McAlexander's reviews echoed that of Genovese. Although both were highly laudatory of his technical and professional skills, Gordon noted that Vandel's interpersonal skills and working with others whom Vandel considered to have less technical talent needed improvement. Similarly, McAlexander wrote that Vandel's

> ability to listen to and work with others of lesser technical skill has presented problems. Martin's pride in his accomplishments does not allow him to accept ideas for possible improvement in his designs by others. He also does not allow him [sic] to be questioned as to why he chose a particular direction. Because of this, he does not function well in a team environment ... In addition, Martin sees himself as being "above" certain tasks such as detailing.

In response, Vandel wrote a memorandum to McAlexander in which he admitted to his lack of cooperation but that he would try in the future to cooperate in the "best manner possible."

At the same time, Vandel wrote a memorandum to the Personnel Department, focusing on his complaints with his evaluations. Firstly, Vandel complained that the evaluations were "polluted (perhaps too strong a word) ... and being distorted as being detrimental to foreigners such as myself...." In one portion of the memorandum, Vandel alleges that it appeared that Standard was trying push him out of the company and then retracts that statement in the same memorandum. At his deposition, Vandel testified as having no difficulties with Genovese whatsoever.[2]

In 1994, Wolf became Vandel's supervisor and began to experience the same interpersonal and other related problems that Genovese had documented in his October 6, 1992 memorandum.

In April, 1994, Vandel advised Gordon that McAlexander had called him "a dumb Polack." Gordon instructed Vandel to write a memorandum to the Director of Personnel, describing all his problems in relation to his Standard employment. The memorandum contains no reference to age discrimination or the alleged "dumb Polack" claim.

In December, 1994, Vandel again wrote to the Director of Personnel, alleging that Wolf insulted Vandel with respect to his Polish heritage. Again, there is no reference to age discrimination or the alleged "dumb Polack" claim.

Upon receipt of the memorandum, the Director of Personnel immediately investigated the accusations made by Vandel. After meeting with Wolf, he requested that Vandel provide him with more details and specifics to better assess his complaint. Vandel was unable to provide any specific examples of ethnic discrimination or harassment. At the close of the investigation, the Director determined that there was no basis to Vandel's claim and, in fact, it was Vandel who was making the disparaging comments concerning Wolf's professional competence, in that, while Vandel held a four-year degree in engineering, Wolf did not. It was the Director's conclusion that it was plaintiff, not Wolf, who exhibited a lack of respect for the other's professional competence.

Vandel's problems with interpersonal relations, insubordinate behavior and difficulty with supervisors continued, and indeed escalated, during late 1994 and early 1995. In December, 1994, Wolf wrote a memorandum to his supervisor requesting

---

1. Vandal never raised the issues of national origin or age discrimination regarding the low evaluations for interpersonal skills and the like.

2. Again, there is no mention of age discrimination.

the termination of Vandel. A meeting was held thereafter among Vandel, Wolf and Paulus. During the meeting, Vandel was again told that he needed to cooperate and be a team player, that Wolf was his boss and that if could not get along with Wolf, the company would be forced to terminate him.

As of April, 1995, problems with Vandel's interpersonal skills persisted, and the relationship between Wolf and Vandel was not improving. In his 1994 evaluation, Wolf emphasized Vandel's continuing problems in the area of human communications/relations, cooperation with other departments and managers and overall attitude. In addition, Wolf noted a problem with support Vandel was giving, or not giving, on the shop floor, his troubleshooting on the shop floor, his resistance to working with a team, and his initiative and stability. Accordingly, Vandel received the lowest ratings possible in these areas.

Following this evaluation, a meeting took place among Vandel, Wolf and Paulus. Vandel was advised that the decision to terminate him had been made by Wolf, Paulus and the Director of Personnel. Vandel was advised that he was being terminated due to: failure to get along with his fellow employees; failure to get along with his boss, Wolf; resistance to authority; inability to work on a team in the Master Cylinder Department; and for being difficult to manage.

Vandel challenged this decision, stating that he had documentation to support his discriminatory treatment at the hands of Wolf. Paulus told him to submit such documentation. Although Vandel was given several months to document his alleged treatment, he submitted nothing to Standard. Nothing was ever reported to Standard regarding age discrimination, either. Vandel was given severance which, *inter alia*, contained a favorable reference. Vandel's last day at Standard was July 14, 1995. At the time of his termination, three employees remained in Vandel's department. Louis Menta was sixty-one years of age, Warren David was fifty-one years of age, and Tony Langello was thirty-four years of age. Vandal was not replaced; rather, his work assignments were divided among these three men.

## LEGAL ANALYSIS

### I. The Standard of Review

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Fed.R.C.V. P. 56(c). See also *Anderson v. Liberty Lobby,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23, 106 S.Ct. 2548. *Accord, Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d. Cir.1995) (movant's burden satisfied by showing if he can point to an absence of evidence to support an essential element of nonmoving party's claim).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party...." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.), *cert. denied,* 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert.*

*denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). If the nonmoving party submits evidence which is "merely colorable", or is not "significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

### II. The Standard As Applied

The elements of proof are the same under Title VII and ADEA. *Woroski v. Nashua Corp.,* 31 F.3d 105, 108–09 (2d Cir.1994). A party must set forth, first, his *prima facie* case and, after the defendant sets forth a legitimate, non-discriminatory reason for defendant's actions, the plaintiff must demonstrate that this reason is pre-textual and that the defendant intentionally discriminated against him in taking the negative action defendant took. "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ A *prima facie* case under Title VII or ADEA consists of four elements:

1) that a plaintiff was in a protected class;

2) that he was qualified for the position at issue;

3) that he was discharged; and

4) that the discharge occurred under circumstances giving rise to an inference of discrimination.

*Viola v. Philips Med. Sys.,* 42 F.3d 712, 716 (2d Cir.1994).

In his complaint, Vandel claims that Standard discriminated against him and terminated his employment in April, 1995, due to his national origin (Polish) and his age (47). However, Vandel cannot meet either the second or fourth prong of a

**3.** It should be noted, however, that Standard set forth several legitimate, non-discriminato-

*prima facie* case of discrimination based on either national origin or age; thus, it is not necessary for Standard to set forth any legitimate, non-discriminatory reasons for Vandel's termination.[3]

■ As to the second element of a *prima facie* case, Vandel was not qualified to do his job. It takes more than technical proficiency to meet the expectations of an employer and Vandel had four years of continuous notice of this. In determining whether an employee meets the qualifications of his job and whether it is satisfactory, courts may rely—as they often must—on evaluations rendered by supervisors. *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985). *See also Stein v. McGraw–Hill, Inc.* 782 F.Supp. 207, 212–13 (S.D.N.Y. 1992) (poor performance evaluations allows court to draw inference that reason for termination was quality of work, and not unlawful discrimination.) Job performance cannot be assessed in a vacuum; the ultimate inquiry is whether an employee's performance "meets his employer's legitimate expectations." *Huhn v. Koehring Co.,* 718 F.2d 239, 244 (7th Cir.1983). As detailed above, the problems with Vandel's interpersonal skills and poor attitude, as documented on numerous occasions by **all** of his supervisors, demonstrates that Vandel was not meeting Standard's legitimate job expectations and was, therefore, not qualified for the job. He, therefore, fails to make a *prima facie* case of discrimination.

■ Furthermore, a thorough review of the record demonstrates no evidence of age discrimination. Vandel, with no details, alleges that he is forty-seven years of age and that his job was assumed by an individual under the age of thirty. Vandel has proffered nothing in support of these claims. In his deposition, Vandel admitted that no comments were ever made disparaging his age or indicating that the company was prejudiced against older workers.

ry reasons for Vandal's discharge.

Vandel conceded that there were "a lot" of people over the age of forty at Standard, who were not terminated or discriminated against by the company, including two of the three individuals in Vandel's department at the time of his termination.

In contrast to his complaint, Vandel testified that he did not know who, if anyone, replaced him at Standard, let alone "an employee less than 30 years old." Pursuant to an affidavit submitted by Standard, no one was hired to replace Vandal. Rather, his work was assumed by his coworkers.

Finally, the three gentlemen by whom the decision was made to terminate Vandal were forty-one, forty-seven and fifty-two years of age, respectively. This further negates any inference of discriminatory animus with respect to Vandal's termination. *See Williams v. Brooklyn Union Gas Co.*, 819 F.Supp. 214, 224–25 (E.D.N.Y.1993). Accordingly, Vandel fails to meet the fourth element of a *prima facie* case of age discrimination, in that he has presented no evidence that his termination occurred under circumstances giving rise to an inference of discrimination.

### *CONCLUSION*

For the reasons set forth above, Vandal has failed to meet his *prima facie* case of discrimination with regard to his age or national origin. Accordingly, Standard's Motion for Summary Judgment [Doc. No. 19] is GRANTED. The Clerk is directed to close this case and enter judgment for defendant.

SO ORDERED.