**Darion M. CARNEY, Plaintiff,**

v.

**THE AMERICAN UNIVERSITY, Defendant.**

**Civil No. 95–1054(JHG).**

United States District Court, District of Columbia.

April 16, 1997.

---

David H. Shapiro, Swick & Shapiro, Washington, DC, for Plaintiff.

Steven R. Semler, Semler · & Pritzker, Washington, DC, Johnny Meldon Howard, Houston & Howard, Washington, DC, for Defendant.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

In this action, Plaintiff Darion M. Carney (Carney) alleges that she was not hired as American University's (AU) Dean of Students, that she was later terminated from her position as AU's Director of Student Services, and that she was denied severance benefits because of her race (defined by the plaintiff as "black African–American" Compl. ¶ 1). Presently pending is AU's motion for summary judgment as to both counts of plaintiff's complaint. For the reasons set forth below, defendant's motion is granted.

### I. Background

The background presented here is found in the pleadings and is not controverted. Ms. Carney was employed by American University from 1981 until her position was eliminated in 1994. She began her tenure with AU as Associate Director of Admissions and became Acting Director of Admissions in 1983 In 1988, she assumed the newly-created position of Director of Student Services. In 1989, Carney was appointed Acting Dean of Students and continued in that capacity for over two years. In 1991, Carney applied for the permanent position of Dean of Students. AU considered her application but eventually selected a white male for the position. Thereafter, Carney returned to her position as Director of Student Services. In 1994, AU terminated Carney's position as Director of Student Services. According to Carney, her application for the position as Dean of Students played a causal role in AU terminating her position three years later.

Broadly construed, Count I of Carney's complaint makes three claims of discrimination under 42 U.S.C. § 1981. First, she asserts that AU rejected her application for the Dean of Students position because she is African–American. Second, plaintiff believes that racial discrimination motivated AU to eliminate her position as Director of Student Services in May 1994. Finally, she contends that AU retaliated against her for asserting her civil rights by refusing to pay her three months severance pay in lieu of written notice of termination. Count II asserts similar causes of action under the District of Columbia Human Rights Act, D.C.Code §§ 1–2512; 1–2525.

AU previously filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Def's Mot. to Dismiss. Assuming, as required, that plaintiff's allegations were true, the Court denied that motion, finding that plaintiff's allegations were "sufficient to constitute a prima facie case under the *McDonnell Douglas* framework." *Carney v. American Univ.*, Civ. No. 95–1054, Mem. Op. and Order at 8 (D.D.C. Nov. 22, 1995) (Mem.Order). Pursuant to Federal Rule of Civil Procedure 56(c), AU now moves for summary judgment as to each of Carney's claims.

### II. Discussion

In its motion for summary judgment, AU argues that Carney's discrimination claim regarding her 1991 non-selection for the Dean of Students position is time-barred.[1] AU also asserts that her claims under District of

---

1. Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 23–28. The Court, however, need not decide that issue because even if this claim is not time barred, it fails as a matter of law.

Columbia law are similarly time-barred. Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 2. In addition, AU argues that Carney fails to present evidence indicating that there is a genuine issue of material fact as to any of her claims and, therefore, summary judgment in AU's favor is appropriate. *Id.* at 28–33, 35–36.

### A. Summary Judgment Standard.

Summary judgment may be granted when the record fails to demonstrate the existence of any genuine issue of material fact. FED. R. CIV. P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. At the same time, however, Rule 56 places a burden on the nonmoving party "to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmovant cannot survive a motion for summary judgment by relying on "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *see Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). In addition, neither the nonmovant's conjecture and surmise nor mere "conclusory allegations of discrimination, without more" are sufficient to defeat a motion for summary judgment. *Grigsby v. Reynolds Metals Co.,* 821 F.2d 590, 597 (11th Cir.1987); *see Yarnevic v. Brink's Inc.,* 102 F.3d 753, 757–58 (4th Cir. 1996) ("Mere conclusory allegations of motivation do not preclude summary judgment."). This is especially true where the nonmovant

would bear the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### B. Race Discrimination Claim Under 42 U.S.C. § 1981.

Section 1981 prohibits racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a) & (b). To make out a claim under § 1981, the plaintiff must show that the defendant intentionally or purposefully discriminated against her. *General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Reynolds v. School Dist. No. 1, Denver, Colo.* 69 F.3d 1523, 1532 (10th Cir.1995). The plaintiff may establish a violation of § 1981 using the same three step framework of proof that is employed in Title VII cases. *Barbour v. Merrill,* 48 F.3d 1270, 1276 (D.C.Cir.1995) *affirming in relevant part Barbour v. Medlantic Management Corp.* 1991 WL 257980 (D.D.C.1991); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff has an initial burden to prove, by a preponderance of the evidence, a prima facie case of discrimination. *Barbour,* 48 F.3d at 1276. The elements of that prima facie case vary slightly depending upon the specific type of discriminatory action alleged. *See McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 796–97 (7th Cir. 1997) (retaliation); *Reynolds,* 69 F.3d at 1534 (promotion); *Barbour,* 48 F.3d. at 1276 (hiring).

Once the plaintiff has met this burden and established a prima facie case, the employer may rebut the resulting inference of discrimination by producing evidence of legitimate, nondiscriminatory reasons for its action. *Barbour,* 48 F.3d at 1276. If the defendant meets this burden of production, the presumption of discrimination raised by the plaintiff's prima facie case drops from the case. *Saint Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2748–49, 125

L.Ed.2d 407 (1993); *see Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). Therefore, to prevail, the plaintiff must then prove, by a preponderance of the evidence, that the defendant's proffered reasons were a pretext for unlawful discrimination. *St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. at 2751–52. In order to show that the defendant's proffered reasons were mere pretexts, the plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *Id.*

■ Therefore, to survive a summary judgment motion, a plaintiff who has established a prima facie case must demonstrate a genuine issue of material fact with regard to the defendant's proffered reasons. In such a situation, the plaintiff's obligation is to identify sufficient admissible evidence from which a jury could find that defendant's proffered nondiscriminatory reasons were, in fact, a pretext for discrimination. *Reynolds,* 69 F.3d at 1533–36; *see St. Mary's Honor Ctr.,* 509 U.S. at 515–16, 113 S.Ct. at 2751–52; *Barbour,* 48 F.3d at 1277. However, as is the case with all summary judgment analyses, the plaintiff's proof of pretext must go beyond metaphysical doubt and mere conclusory allegations. It is in this respect that Carney fails to meet her burdens.

This Court has previously determined that Carney has alleged a prima facie case. *Carney v. American Univ.,* Civ. No. 95–1054, Mem. Op. and Order at 8 (D.D.C. Nov. 22, 1995) (Mem.Order) (denying AU's motion to dismiss). Therefore, upon AU's motion for summary judgment, the burden of production shifts to AU to provide nondiscriminatory reasons for the actions it took with respect to Ms. Carney. As detailed below, AU successfully bears this burden of production. Consequently, to survive the motion for summary judgment, Carney must present sufficient admissible evidence from which a jury could find that AU's reasons are pretextual. Instead, she rests on the strength of her prima facie case. and presents only conclusory allegations. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553; *Mitchell v. Baldrige,* 759

F.2d 80, 87 (D.C.Cir.1985) ("[T]he relatively light prima facie requirements do not alter the plaintiff's burden of ultimately persuading the factfinder by a preponderance of the evidence that the 'defendant intentionally discriminated against the plaintiff.'") (quoting *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)). Accordingly, summary judgment is appropriate.

### 1. Discriminatory Non–Selection for the Dean of Students Position.

After several unsuccessful searches, American University began another formal search for a new Dean of Students in the fall of 1991. Def.'s Mot. Ex. 1 (Deposition of Darion M. Carney) ("Def's Mot. Carney Dep.") at 45–48. Maurice O'Connell, Vice Provost of Student Life and Carney's supervisor, chaired the search committee and asked Carney to suggest staff members and students to participate on the committee. *Id.* at 48–49. At least two students and two faculty members proposed by Carney were included on the search committee. *Id.* at 49–51. The members of the 1991 search committee included six Caucasian females, one African–American female, two Caucasian males, two African–American males, one Hispanic female, and one Oriental male. Def.'s Mem. at 7–8.

One hundred sixty four people applied for the position of Dean of Students. Def.'s Mot. Ex. 2 Dep. Ex. 1 (Confidential Report on Dean of Students Search Process Fall 1991) (hereinafter "Search Process Report") at 4. After considering all of the applicants, the search committee narrowed the pool to the top 17 candidates; Ms. Carney was one of those 17. *Id.* at 7. Eleven of these candidates, including Ms. Carney, were interviewed by the committee. *Id.* at 9. The committee then met and narrowed the pool to four finalists and two back-up candidates; Ms. Carney's application did not survive this cut. *Id.* at 13. After a further round of interviews for the finalists, the Dean of Students position was offered to John Martone, a Caucasian male.[2]

---

**2.** *Id.* at 17. For personal reasons, Dr. Martone did not immediately accept the offered position.

*Id.*

■ AU proffers abundant non-discriminatory reasons, supported by deposition testimony from several members of the Dean of Students Search Committee, for rejecting Carney's candidacy. First, AU strongly preferred a candidate who possessed a doctorate degree. *See* Def.'s Mot. Ex. 2 (Deposition of Maurice O'Connell) ("Def.'s Mot. O'Connell Dep.") at 91 ("And in all our searches, we were clear that we really wanted someone with a doctorate."). In fact, the Dean of Students search advertisements stated "Doctorate preferred." Search Process Report at 21–23 (copies of advertisements placed in Chronicle of Higher Education, Black Issues in Higher Education, and the Washington Post). One of the key reasons the search committee eliminated Carney from further consideration was her lack of a doctorate degree. Def.'s Mot. O'Connell Dep. at 91 ("The biggest thing was not having the doctorate."); Def.'s Mot. Ex. 9 (Deposition of Patricia Van der Vorm) ("Def.'s Mot. Van der Vorm Dep.") at 37 ("the Ph.D. was probably a preferred qualification when the position was listed and, as there was discussion about how do we [i.e., the search committee] move to a realistic number of second-round candidates, the group agreed that the Ph.D. would be one of the selection factors for moving candidates forward"); *id.* at 41 ("Q: So [the committee] eliminated everybody without a Ph.D., and that means Ms. Carney washed out? A: Yes.").

After the elimination of Carney and several other candidates, four finalists and two "back-ups" remained in the pool of candidates. Search Process Report at 13. Each of these candidates possessed a doctorate degree. *Id.* Two of the four finalists were African–American black females. *Id.* In fact, Carney was the only applicant granted an interview who lacked a doctorate degree. *See* Def.'s Mot. O'Connell Dep. at 91; Search Process Report at 10.

Another reason Carney was eliminated from consideration for the Dean of Students position was her lack of visibility among AU's students, despite her more than two years' experience as Acting Dean. Def.'s Mot. Van der Vorm Dep. at 33–36; *see* Search Process Report at 3 (among the "key qualifications for the successful candidate: ... appropriate student development/advocacy perspective, to include a commitment to being accessible and highly visible."). The student members of the committee, on their own initiative, "made an effort to gather information from the students on campus that they felt they were representing; and their impression was that there were a lot of students who didn't know who Darion was." Def.'s Mot. Van der Vorm Dep. at 35. Therefore, several student committee members "expressed concern that [Carney] had served for a couple of years as acting dean and a lot of students didn't know who she was." *Id.* at 35–36. In fact, none of the students expressed a desire that Ms. Carney be hired as Dean of Students and several said that they felt she should not get the job. *Id.* at 33–34; Def.'s Mot. O'Connell Dep. at 93, 95–97.

In addition to high visibility, AU also preferred a candidate who, if selected, would be comfortable with the erratic time demands of the Dean of Students job. *See* Def. Mot. O'Connell Dep. at 95–103; Def.'s Mot. Carney Dep. at 90 (indicating that a "key component" of the Dean of Students position is attending nighttime and weekend student activities); *id.* at 68 (noting that emergency phone calls at three a.m. are part of the Dean of Students job). Carney's candidacy was not pursued further because, during her interview, she indicated an unacceptable degree of hesitancy at being on call twenty-four hours a day. Def.'s Mot. O'Connell Dep. at 100–02; Def.'s Mot. Van der Vorm Dep. at 54 ("There was one factor I remember that I thought was a significant bad," with regard to Carney's candidacy and that was her hesitancy about "disruptive phone calls or the hours demanded by the job."); Def.'s Mot. Carney Dep. at 67–68 (confirming that, when interviewed by the committee, she revealed that three a.m. phone calls were her least favorite part of her role as Acting Dean of Students). In fact, her "reticence was a 'pivotal point' in the interview process for [Carney], and had a 'chilling effect' on her candidacy." Def.'s Mot. O'Connell Dep. at 100–02. When deposed, Carney freely ad-

mitted that she had expressed ambivalence concerning the Dean of Students position "because of the high level of demands on personal time required by the job." [3]

The record reflects several other non-discriminatory reasons why Ms. Carney was not selected as Dean of Students. For example, the search committee was more impressed with the broad-based experience offered by some of the other applicants, including Dr. Martone. Def.'s Mot. Ex. 10 (Deposition of Dr. Faith Leonard) ("Def.'s Mot. Leonard Dep.") at 37–38 ("Q: Do you remember why Ms. Carney was not selected ... ? A: She did not have as broad-based experience as the person—people—who were selected."). The committee was also intrigued by the "new ideas ... or new innovative kinds of things" that other candidates proposed, during their interviews, to bring to the position of Dean of Students at American University. Def.'s Mot. Van der Vorm Dep. at 37–38.

For all of these reasons, the search committee voted *unanimously* to eliminate Darion Carney from consideration.[4]

In her opposition to AU's motion, other than conclusory allegations, Carney fails to point to *any* evidence from which a jury could find that AU's proffered reasons were pretextual. In fact, she fails to address AU's proffered reasons; instead she merely reit-

erates her conclusory allegations that "she felt discriminated against," that she suffered "rather shabby treatment," and that the hiring of John Martone as Dean of Students was "blatant favoritism for a white." Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") at 28. Conclusory allegations, particularly conclusory allegations that do not address defendant's proffered nondiscriminatory reasons for its action, are completely insufficient to withstand summary judgment. *Yarnevic,* 102 F.3d at 757–58 ("Mere conclusory allegations of motivation do not preclude summary judgment.").

▮▮▮ In order to view the evidence in the light most favorable to the plaintiff, as the Court must at this stage, the Court has closely examined the record for evidence that AU's asserted reasons were pretextual.[5] However, the Court fails to find any evidence to indicate that AU's proffered reasons—lack of a doctorate degree, low visibility among students, reluctance to be available around-the-clock, lack of broad-based experience, new ideas proposed by external candidates— were pretextual. What the Court does find is argument from Carney that the search committee's selection criteria should not have been applied to her in the way that they were.[6] The fact that Carney disagrees with

---

**3.** Def.'s Mot. Carney Dep. at 93–95 ("Q: Did you tell anyone at the University before you applied for the '91 search that you were ambivalent about applying for the position because of the high level of demands on personal time required by the job? A: I'm sure I must have said that, too, to some people.... Q: Do you recall having told anyone in the division of student life in words or in substance that your unwillingness to devote 100 percent of your time to the dean of students' position was one of the issues going against you in the selection process in the '91 selection search? ... A: I might have.")

**4.** Def.'s Mot. Van der Vorm Dep. at 41 (emphasis added). According to plaintiff, after the selection process was completed, one of the committee members told her that several committee members were disappointed that Carney had not been selected. Def.'s Mot. Carney Dep. at 71–72. However, Carney admits that she has no information about how anyone on the committee actually voted. *Id.* at 74.

**5.** The Court notes that Carney submitted only brief excerpts of her own deposition testimony in support of her Opposition. *See* Pl.'s Mem. Ex. 1

(pages 1–2, 41–45 of Deposition of Darion H. [sic] Carney). She submitted similarly brief portions of other deposition transcripts. Therefore, most of the citations in this opinion are taken from the more complete transcripts submitted as part of defendant's Motion for Summary Judgment.

**6.** At bottom, plaintiff believes that the Dean of Students selection process must have been discriminatory because, in her mind, she was clearly the most qualified candidate: "It was unfathomable to me that having successfully acted in the position for two and a half years that there could be somebody who had more or better experience." Def's Mot. Carney Dep. at 76; *id.* at 75 (Q: "Did you feel discriminated against on the basis of your race at the time Maury [O'Connell] told you tht [sic] you were not selected?" A: "Yes.... Because of the candidates, I felt that I was the one who had the greatest knowledge of the University, [and] that was the most diverse and appropriate experience.").

However, in her deposition testimony, plaintiff clearly admits that several of the selection criteria describe important facets of the Dean of Students position. For example, when ques-

AU's criteria or with the way in which the criteria were applied to her application is not relevant to her claim of racial discrimination. To survive summary judgment, she must point to some evidence in the record from which a jury could find that AU's proffered nondiscriminatory reasons were pretextual. Argument alone is insufficient to carry this burden. The material issue here is not the soundness of AU's business judgment, but only whether or not AU discriminated against Carney based on her race. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir.1997) ("[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, at least not where, as here, the reason is one that might motivate a reasonable employer."); *Reynolds*, 69 F.3d at 1535 ("[A]n employer's exercise of erroneous or even illogical business judgment does not constitute pretext.").

### 2. Elimination of Plaintiff's Position.

In 1992, after plaintiff was not selected as Dean of Students, she returned to her former position as Director of Student Services. Def.'s Mot. Carney Dep. at 181, 182–183, 192. By the end of the next year, AU was experiencing budget shortfalls due to declining enrollment. *Id.* at 198. By 1994, according to plaintiff's own papers, the "record evidence . . . is surely undisputed" that AU had to make budget cuts. Pl.'s Mem. at 16. As result of this 1994 budget cutting, Ms. Carney's job was eliminated and her employment with American University terminated. *Id.* at 16–17.

In the context of AU's earlier Motion to Dismiss, this Court determined that Carney has alleged a prima facie case of discrimination with regard to her termination. *Carney v. American Univ.*, Civ. No. 95–1054, Mem. Op. and Order at 8 (D.D.C. Nov. 22, 1995) (Mem.Order). Therefore, as described *supra.* the burden of production shifts to defendant American University to proffer nondiscriminatory reasons for terminating Carney's employment. Once AU does so, the presumption of discrimination drops from the case and Carney cannot, therefore, rely on the fact that she has met "the relatively light prima facie requirements," *Mitchell*, 759 F.2d at 87, to survive summary judgment. She must point to some evidence in the record which could demonstrate that AU's proffered reasons are, in fact, a pretext for discrimination. Because she fails to do so, summary judgment is appropriate.

To satisfy its burden of production, AU offers evidence to show that plaintiff's termination was one part of a university-wide effort to cope with severe budget shortfalls. This fiscal crisis was precipitated by falling graduate and undergraduate enrollment and a consequent decline in revenue. Def.'s Mot. Ex. 4 (Affidavit of Dr. Ann Ferren) ("Def.'s Mot. Ferren Aft.") Attach. G (Memorandum to Vice Presidents, Vice Provosts, and Deans from Elliot Milstein & Ann S. Ferren, Interim Provosts (February 8, 1994)) ("Milstein & Ferren Memo"); *see* Def.'s Mot. Ex. 3 (Deposition of Dr. Ann Ferren) ("Def.'s Mot. Ferren Dep.") at 20–21. (Over 95% of AU's budget is funded by tuition, housing, and

---

tioned about the need for the Dean to be highly visible, Carney acknowledged that "a dean of students should be accessible for students and students should know that person or that office exists and is welcoming to them," *id.* at 91; but argued that she did have a high level of student interaction, *id.* at 92. With regard to the time demands on the Dean of Students, Carney agreed that it is the nature of that position that the Dean must be on call for any situation that arises seven days a week, 24 hours a day. *Id.* at 94. She also admits that she told someone at AU prior to the 1991 search that she was ambivalent about applying for the Dean of Students position because of the high demands that position would make on her personal time. *Id.* at 93; *see id.* at 67–68 (plaintiff told selection committee during her interview that the aspect of the acting Dean of

Students position that she liked least was "getting calls in the middle of the night, which was a usual occasion.")

Plaintiff admits that her application, submitted after she had participated in naming the members of the selection committee, put Maurice O'Connell, her supervisor and the chairman of the selection committee, "on the spot." *Id.* at 58. According to Carney, "his body language, his pursed lips" indicated his surprise at her last-minute application. *Id.* However, assuming that plaintiff is correct about her supervisor's reaction to her application, this does not indicate that even one of AU's proffered reasons is pretextual or racially discriminatory. *See also infra* n. 17 (indicating that O'Connell remained neutral throughout the search process).

auxiliary services. Def.'s Mot. Carney Dep. Ex. 10 ([AU] Senate Finance Committee Report, Dec. 1993) ("Finance Comm. Rpt.") at 00319.)

In December 1993, the AU Senate Finance Committee issued a report calling for a "ten percent reduction in [each administrative office's] non-academic budget over the next five years" and recommending that "university-wide administrative costs ... be the first area looked at." [7] That same month, Provost Ferren met with Maurice O'Connell about the Division of Student Life's budget and urged him to consider "different ways of providing services more efficiently/effectively," including "eliminat[ing] managers who manage managers." [8] In fact, because salaries and benefits accounted for 93% of the Division's budget, eliminating personnel was one of the few ways that the Division could achieve significant budget reductions.[9] The admonition to eliminate "managers managing managers" was repeated in the Budget Advisory Committee's Preliminary Report issued in April 1994.[10] Carney admits that her job was just such a position. Def.'s Mot. Carney Dep. at 204 ("Q: ... you were a manager managing managers? A: Yes.").

In February 1994, all Vice Presidents, Vice Provosts and Deans were asked to "fundamentally rethink your functions and organizations to find ways of altering how they operate and how they are organized and staffed. to reevaluate the services they deliver" and told to "identify for elimination or reduction all that is not central to the mission of advancing the University." Def.'s Mot. Ferren Dep. Ex. G (Memorandum from Elliott Milstein, Interim President, and Ann S. Ferren, Interim Provost, to Vice Presidents, Vice Provosts, and Deans (February 8, 1994)). A week later, the Division of Student Life's managers, directors, and assistant directors met with Maurice O'Connell and John Martone to discuss further budget reduction strategies. Def.'s Mot. O'Connell Dep. at 230–31; Def.'s Mot. Carney Dep. at 199–200 At that retreat, the heads of various Division of Student Life units were required to summarize their unit's functions and their job responsibilities. Def.'s Mot. Carney Dep. Ex. 12 (Notes Summarizing Functions of Various Positions with Division of Student Life). Carney indicated that the majority of her time as Director of Student Services was

7. Finance Comm. Rpt. at 00320. The Report noted that AU's "ratio of spending on instruction and research to our spending on administration" placed the university nearly last among similar schools. *Id.* In fact, the Middle States Evaluation Committee, which evaluated the university as part of its accreditation process, ranked American University "next to last in the proportion of spending on instruction and research" among 23 peer institutions. *Id.* The Committee asserted that cutting administrative expenditures was particularly important "for the symbolic goals it represents in terms of redirecting resources to the primary task of the university, that is, its students and the quality of their educational experience." *Id.*

8. Def.'s Mot. Ferren Aff. Attach. D (notes of Budget Meeting between Ann Ferren and Maurice O'Connell (Dec. 13, 1993) at 00314. Ferren also questioned whether student health services could be provided more "efficiently and effectively" and whether there might be a better way to budget disability support services. *Id.*

9. Def.'s Mot. Ferren Aff. Attach. D (notes of Budget Meeting between Ann Ferren and Maurice O'Connell (Dec. 13, 1993) at 00314. Before lay-offs were considered, O'Connell had re-

duced the Division's budget by eliminating two full-time professional positions that were currently vacant, reducing the number of graduate advisors, increasing the use of work-study students, and reducing replacement costs for residence hall furniture. Def.'s Mot. Ferren Aff. Attach. F (Memorandum from Maurice O'Connell to Elliot Milstein & Ann Ferren outlining AY95 Budget Reduction Formulation: Expenditure Reductions (Feb. 25, 1994)). However, continuing budget cuts subsequently required elimination of some non-essential *managerial* positions. Def's Mot. Ferren Aff. Attach. H (Memorandum to Ann Ferren from Maurice O'Connell entitled Reorganization of the Division of Student Life (June 27, 1994)) at 000487–88.

10. Def.'s Mot. Carney Dep. Ex. 11 (Budget Advisory Committee Preliminary Report (April 11, 1994)) at 00345. The Budget Advisory Committee was composed of "a broad representation of the university community, including individuals representing major administrative units, deans, faculty, students, and staff" and had reviewed the budget reduction proposals of twenty different university units. *Id.* It was established "to review recommended spending cutbacks and to set priorities for all proposed budget reductions." *Id.*

spent on supervisory, oversight, and support functions.[11]

That meeting did not result in specific recommendations regarding elimination of staff positions. Def. Mot. O'Connell Dep. at 232. However, shortly after that meeting, several members of the Division approached either John Martone or Ann Ferren to question whether, in light of the directive to eliminate "managers managing managers," Darion Carney and Stacy Morgan–Foster's positions were truly necessary.[12] Because further budget cuts were required, Vice Provost O'Connell decided to eliminate both the Director of Student Services position (Carney) and the Assistant Dean of Students position (Morgan–Foster) and to transfer the functions of these positions to front-line members of the Division.[13] A financial ana-

lyst, a career center executive assistant, an auditor, and "several people in the development area" also had their employment with American University terminated during this round of budget cuts.[14]

■ To summarize, AU has proffered evidence indicating that plaintiff was *not* personally targeted in the downsizing process; rather, her position was eliminated because its functions could be transferred to other members of the Division of Student Life without negatively affecting the quality of services provided to the students.[15] Therefore, AU has met its burden of production by presenting nondiscriminatory reasons for terminating Carney's employment. Accordingly, the presumption of discrimination drops from the case, and the burden shifts to Carney to present evidence from which a jury

11. *Id.* at 000251; Def's Mot. Carney Dep. at 259 ("Q: To the extent [Exhibit 12] describes the job of director of student services at the retreat, is it accurate? A: I think it is."). Specifically, the functions of the "Director of Student Services Position" were:
40% Provide supervision and oversight of CPLS, SHC, Disability Support Services, Information and Off–Campus Housing units; work with staff to develop and implement policies and programs which are service oriented and consistent with DSL mission; monitor budget and personnel resources to ensure that services and activities are maximized in support of student retention.
15% Evaluate, negotiate and oversee implementation of Student Health Insurance plan and tuition refund insurance; articulate policy and benefit interpretation concerns to carrier.
25% Serve as student advocate working with administrative offices to help resolve student issues on an individual basis and, through participation in DSL and campus committees, identifying potential policy and systems enhancements which might benefit students in general.
20% Provide support to VPSL and Central Office; represent interests of students and DSL on Classification Committee, Athletic Committee, Shopbusters' Team, et. al. [sic].
*Id.* Ex. 12 at 000251. *See also* Def's Mot. Carney Dep at 201 (making rough estimates that her job functions were "35–40 percent supervision or management and oversight of the units reporting to me, probably 20–25 percent student advocacy, 20–25 percent support to the vice provost, 20–25 percent representation on University task force committees.").

12. Def. Mot. O'Connell Dep. at 232–35. Stacy Morgan–Foster served as the Assistant Dean of Students. In that position, her responsibilities

included supervising the disciplinary and student judicial systems, plus oversight of two or three small units. *Id.* at 123–24; Def.'s Mot. Ferren Dep. at 69–70.

13. Def. Mot. O'Connell Dep. at 236–41; Def.'s Mot. Ferren Dep. at 67–68. The decision to eliminate Morgan–Foster's position did not result in her involuntary termination because she left voluntarily to take a position at another university. Def. Mot. O'Connell Dep. at 241–42; Def.'s Mot. Ferren Dep. at 71. Interim Provost Ann Ferren approved the reorganization of the Division of Student Life and the consequent elimination of Carney's position. Pl.'s Mem. Ex. 6 (Deposition of Ann S. Ferren) at 94–95.

14. Pl.'s Mem. Ex. 6 (Deposition of Ann S. Ferren) at 106. *Approximately a dozen employees* were terminated in budget-driven restructurings between 1993 and 1995. Def.'s Mot. Ex. 8 (Deposition of Dennis A. Kirk) ("Def.'s Mot. Kirk Dep.") at 26–27. Of these, six or seven were senior or executive staff such as Darion Carney. *Id.* at 27–28.

15. *See* Def.'s Mot. Ferren Aff. Attach. H (Memo to Ann Ferren from Maurice O'Connell on Reorganization of the Division of Student Life (June 27, 1994)) (outlining new job responsibilities in light of elimination of Associate Director of CPLS and Director of Student Services positions); *id.* at Attach. I (Memo to Deans, Department Chairs and Directors from Maurice O'Connell on Reorganization of the Division of Student Life (July 25, 1994)) (same); Pl.'s Mem. Ex. 9 (Deposition of Anne M. Steen) at 11–12 (indicating that, as a result of the reorganization, in June 1994 she was given additional managerial responsibilities while retaining her role as director of residential life and housing services).

could find that AU's proffered reasons were pretexts for discrimination.

■ In response to AU's proffered reasons, Carney repeatedly emphasizes the "strength of [her] admitted prima facie case," Pl.'s Mem. at 19, 22 ("Given the strength of plaintiff's prima facie case . . . it is altogether possible . . . that a jury could conclude that Ms. Carney was the victim of discrimination."). However, such arguments are irrelevant to her burden at this stage because the strength or weakness of her prima facie case has no bearing upon whether or not AU's proffered reasons were pretextual. Carney also again questions AU's business judgment.[16] As discussed *supra,* however, the material issue here is not the soundness of AU's business judgment, but only whether or not AU discriminated against Carney based on her race. *See Combs,* 106 F.3d at 1543; *Reynolds,* 69 F.3d at 1535. To survive summary judgment, Carney must present some evidence from which the finder of fact could conclude that AU's proffered reasons were a pretext for discrimination.

Carney also contends that AU's proffered reasons must be pretextual because, she asserts, Maurice O'Connell is not credible and he is the person who "targeted Ms. Carney for termination of employment in this budget-driven 'restructuring' of his Student Life department" and who "saw to it that it was plaintiff who was terminated." Pl.'s Mem. at 17. However, considering all evidence in the light most favorable to the plaintiff, the Court cannot find this conclusory allegation

sufficient to carry plaintiff's burden. To support her case that O'Connell targeted her for termination, Carney stretches back to the 1992 Dean of Students search and claims that O'Connell did not want to her apply for the position and, once she did, was forever hostile to her. Pl.'s Mem. at 16. As evidence of this hostility, she argues that O'Connell lowered her performance appraisals and selected her, rather than anyone else in the Division of Student Life, for termination. *Id.* at 17. The fatal flaw in Carney's circular logic is the complete absence of any indication that any of O'Connell's actions were based on race.

O'Connell admits that he was "caught by surprise" when Carney submitted an application for the Dean of Students position. Def.'s Mot. O'Connell Dep. at 68. Her application was awkward for O'Connell because O'Connell, her direct supervisor, was chairman of the search committee, *id;* because Carney herself had participated in selecting some of her subordinates to be members of the committee, *id.* at 103–04; and because she listed O'Connell and other members of the search committee as her references, *id.* at 207–08. None of these concerns are racially based and Carney admits that her application "put [O'Connell] on the spot." Def.'s Mot. Carney Dep. at 58.

Had Carney indicated to O'Connell before the search began that she was interested in the position, he would have asked someone else to chair the search committee, Def.'s Mot. O'Connell Dep. at 207, and would have

---

16. Def.'s Mot. Carney Dep. at 205–06. Carney's comments are revealing. In fact, she would not respond directly when asked if she believes AU intentionally discriminated against minorities in its response to the budget crisis:

> Q: Do you believe that the budget advisory committee report to eliminate managers managing managers was a device which was come up with by the budget advisory committee to eliminate minorities or do you feel that it was an economically well-founded report?
> A: I don't think it is economically well-founded report. I think the effect, intended or not, would have been to eliminate managers, some minorities.
> Q: Do you have any reason to believe that it was not an economically, well-founded report?
> A: My understanding was not—my understanding about the report was not that it said to eliminate all managers managing managers

but to reduce the number. . . . And it was a way to address that could be used as a rationale, remedying the budget deficiency, but not the only way.
> Q: So you feel for that reason that it was not economically well founded in that it was not the only way to deal with the budget deficiency in your view?
> A: Right.
> Q: Any other reason? . . . That it was not an economically well founded report?
> A: No.

*Id.* at 205–06. Carney concedes the existence of a budget crisis, *id.* at 202–03; Pl.'s Mem. at 16; but believes that AU should have found some way to resolve the crisis without terminating her employment. However, she does not suggest any way that the necessary budget reductions in the Division of Student Life could have been accomplished without personnel reductions.

given her a high recommendation for the job.[17] In fact, had the 1991 search failed to find a new Dean of Students (as the previous two searches had), O'Connell was prepared to propose to student leaders that Carney be appointed Dean of Students.[18] However, once Carney's application had been rejected by the search committee (for nondiscriminatory reasons, *see supra*), appointing her to the position was no longer a viable alternative—for obvious reasons having nothing to do with Carney's race.

Carney also cites her allegedly lowered performance evaluations as evidence of O'Connell's hostility. However the four performance evaluations in the record—March 17, 1990; March 1991; October–November, 1991; and October 14, 1993 [19]—reveal fairly consistent rankings. Considered across all four evaluations, Carney performed consistently in the "Greater Than Required (4)"—"Meets Expectations (3)" range with a rare "Exceptional (5)" mark, and never any "Less Than Desired (2)" or "Inadequate (1)" ratings.[20] While the October 14, 1993, evaluation is less flattering than the October–November 1991 evaluation, it is quite similar to both the March 1990 and March 1991 ratings. The evidence of hostility in these evaluations is "thin to the point of virtual invisibility," *Barbour*, 48 F.3d at 1281 (Statement of Williams, J., concurring in denial of rehearing en banc); evidence that AU's budget crisis and restructuring were pretexts for racial discrimination is completely absent.

Because Carney has not pointed to any evidence from which a jury could find AU's budget crisis, downsizing, and consequent termination of her position to be pretexts for racial discrimination, summary judgment is appropriate. Carney's conclusory allegations that her supervisor was hostile or is lying, without some evidence that his actions were racially motivated, do not carry her burden.

## C. Retaliation Claim Under § 1981.

▮ This Court has previously determined that § 1981 applies to retaliation claims involving the exercise of contractual rights. *Carney v. American Univ.*, Civ. No. 95–1054, Mem. Op. and Order at 9 (D.D.C. Nov. 22, 1995) (Mem.Order). To demonstrate a prima facie claim of retaliation, the plaintiff must show: " '(1) that she engaged

**17.** *Id.* at 208–09. During the actual search process, O'Connell did not supply Carney with a reference, either positive or negative, because she never asked. *Id.* at 210. In order to avoid conflict of interest problems, O'Connell did not voice an opinion about Carney during the search committee decisional meeting. *Id.* at 100. Nor did he vote on retaining or eliminating any of the candidates. *Id.* at 82.

**18.** *Id.* at 67–71 (indicating that Carney and O'Connell discussed this just prior to her 1994 termination). Before the 1991 search began, O'Connell approached the executive board of the student council about how to fill the still-vacant Dean of Students position. *Id.* at 71. The students insisted upon another national search, rather than appointment of someone to the position. *Id.* The university acquiesced. *Id.*

According to Carney's testimony, O'Connell mentioned to her the possibility of Carney's being appointed Dean if the search failed to find a viable candidate before she submitted her 1991 application. Def.'s Mot. Carney Dep. at 53–56. However, Carney's own testimony fails to indicate any racial bias in O'Connell's comments:

Q: Is it that comment that you took to be discouraging you from applying for the dean of students position?

A: In the context of that comment, he did also say words to the effect that, "There is no reason for you to apply, or you shouldn't apply, because if the search is unsuccessful, then I'll be in a position"—he would be in a position to appoint me. He could show they tried to look outside the University for the best person nationally, because that was a big thing at the University, because they rarely promoted internally to high positions; that he would be in a position to appoint—because I would have been acting dean—he would be in a position to appoint me dean permanently. *Id.* at 54–55; Pl.'s Mem. at 13.

**19.** Def.'s Reply Br. Attach. 2 (Oct.1990 Evaluation); Pl.'s Mem. Ex. 2 (Mar.1991 Evaluation); *id.* at Ex. 3 (Oct.-Nov.1991 Evaluation); *id.* at Ex. 4 (Oct.1993 Evaluation).

**20.** Carney's "Overall Performance Rating" ranged from slightly higher than "Meets Expectations" in October 1990 to "Greater Than Required Level of Performance" in March 1991, to between "Exceptional" and "Greater Than Required Level of Performance" in October–November 1993 to both "Greater Than Required Level of Performance" and "Meets Expectations" in October 1993. In addition, more than 80% of her scores in the seven categories evaluated were "Greater Than Required Level of Performance," "Meets Expectations," or something in between those two rankings.

in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two.'" *Mitchell,* 759 F.2d at 86 *quoting McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984); *Cones v. Shalala,* 945 F.Supp. 342, 350 (D.D.C.1996). Plaintiff must offer evidence as to each necessary element of her claim. If, for example, she offers evidence as to only the first and second elements, but fails to offer evidence as to causation—the third element—*Celotex* holds that no genuine issue of material fact exists. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Further, to resist a motion for summary judgment on this claim, plaintiff must offer *admissible* evidence; evidence not admissible at trial cannot shield plaintiff from summary judgment. *Lang v. Star Herald,* 107 F.3d 1308, 1311 (8th Cir.1997); *Beyene v. Coleman Sec. Servs., Inc.,* 854 F.2d 1179, 1181 (9th Cir.1988). Because Carney does not present evidence from which a reasonable jury could infer causation, summary judgment will be granted.

In early May 1994, Carney was told that her position was being eliminated and her employment with the University terminated. Def.'s Mot. Carney Dep. at 214. Her severance package included seven months severance pay.[21] In addition, Carney was offered outplacement services in exchange for a release of liability. Def.'s Mot. Kirk Dep. at 28–29, 33–34 (stating that signing a release was a condition precedent to obtaining the additional benefit of outplacement); *id.* at 64 (indicating that he signed such a release when his employment with AU was terminated). However, when presented with the written severance package and an attached release, Carney balked. Def.'s Mot. Carney Dep. at 229. According to her own deposition testimony, Carney merely said that she wouldn't sign the release because she "needed to think about it." *Id.* at 229. She ad-

mits that, at that point, she had not told AU that she was going to sue, *Id.* at 227, and that AU had no knowledge that she was asserting a civil rights claim, *Id.* at 227–28. Acting on the good faith belief that Carney would sign the release, AU began her outplacement services. However, in early June, Carney told AU that she "would no longer be negotiating on [her own] behalf for the severance package, but that [her] attorney would be." *Id.* at 230. Accordingly, her outplacement benefits ceased. *Id.* Again, Carney made no mention of discrimination at that time; she indicated only that an attorney would be negotiating a severance package for her.[22] On June 10, 1994, her attorney wrote to AU and, for the first time, raised a racial claim. Def.'s Mot. at 22; Def.'s Mot. Carney Dep. at 250. In later correspondence with AU, Carney's attorney claimed that she was entitled to additional severance pay (i.e., six months severance pay plus an additional three months pay in lieu of written notice of termination). *See, e.g.,* Pl.'s Mem. Attach. 13 (Letter from David Shapiro to Steven Semler (March 6, 1995)).

▪ Viewing the evidence in the light most favorable to Carney, she alleges that she engaged in statutorily protected activity (i.e., asserted her rights under § 1981) and that AU took adverse action towards her (i.e., refused to pay an additional three months severance benefit), but offers no evidence to demonstrate the required causal connection between these two elements. There are two insurmountable hurdles blocking plaintiffs attempt to assume causation. First, she provides no evidence indicating that AU knew that she was asserting her civil rights prior to June 10, 1994, the date plaintiffs counsel first contacted AU. Therefore, any action AU took prior to June 10, 1994, (i.e., determining that Carney would receive only seven months severance) cannot

---

21. The parties agree that six months of this severance pay was the standard amount for someone at Carney's professional level. Def.'s Mot. Carney Dep. at 223; *see* Def.'s Mot. Kirk Dep. at 22. Carney believed that the additional month's pay was for "compassion." Def.'s Mot. Carney Dep. at 224, 242. University officials understood that it was provided in lieu of notice of her termination. Def.'s Mot. Ferren Dep. at 114.

22. *Id.* ("Q: Did you mention to him [Dennis Kirk] at that point that you felt there was race discrimination or just that your attorney would negotiate severance for you? A: I told him that I would not be talking to him. He needed to talk to my attorney. Q: About the negotiation of the severance? A: Period.").

logically have been taken in retaliation for action that Carney did not take until that date. Second, plaintiff's papers admit that AU's action with regard to Carney's severance-payment-in-lieu-of-written-notice was, at most, an oversight—"when nearing the end of her severance pay period in late 1994 ..., defendant became conscious that it had both failed to give Ms. Carney three months notice and failed to provide her pay in lieu of such notice." Pl.'s Mem. at 25. Because Carney cannot point to specific facts indicating a causal relationship between the denial of severance benefits and her actions under section 1981 and District of Columbia law, summary judgment will be granted.

■ Plaintiff attempts to bolster her retaliation claim by citing settlement negotiation letters between plaintiff and defense counsel, *see* Pl.'s Mem. Attach. 12 (Letter from Steven R. Semler, Attorney for American University, to David H. Shapiro, Counsel for Carney (Dec. 12, 1994)) & Attach. 13 (Letter from David Shapiro to Steven Semler (March 6, 1995)), and offers these letters as evidence to resist defendant's motion for summary judgment. However, Federal Rule of Evidence 408 bars evidence of compromise negotiations from admission into evidence, *see* FED.R.EVID. 408. Therefore, these settlement negotiation letters would not be admissible at trial. Plaintiff cannot rely on settlement negotiations—inadmissible evidence—to establish causation, a necessary element of her case. Therefore, because plaintiff offers no evidence, admissible or otherwise, to support an inference of causation this claim must be dismissed.[23]

*D. District of Columbia Law Claims.*

■ Plaintiff also asserts claims under the District of Columbia Human Rights Act (DCHRA), §§ 1–2512; 1–2525. Specifically, her complaint alleges that AU violated the DCHRA when it terminated her position as Director of Student Services and in its alleged retaliation against her for asserting her civil and human rights. Compl. ¶¶ 13–17, 20–21. The same legal standards govern both DCHRA claims and section 1981 suits. *See Goss v. George Washington Univ.,* 942 F.Supp. 659, 661 n. 3 (D.D.C.1996) (citing *Miller v. American Coalition of Citizens with Disabilities,* 485 A.2d 186, 189 (D.C. 1984)). Because the same standard governs plaintiff's federal and District of Columbia claims, and for the reasons discussed in detail *supra,* the Court will dismiss Count II.[24]

### III. Conclusion

Accordingly, it is hereby

**ORDERED** that defendant's motion for summary judgment as to Counts I and II is granted and, in accordance with Fed.R.Civ.P. 58, judgment shall be entered in favor of defendant American University and against plaintiff Daion M. Carney, as reflected on the judgment page of this date.

IT IS SO ORDERED.

---

**23.** The Court notes that even if these settlement letters were admissible, they would not help plaintiff establish causation. This is the case because AU denied Carney the three months pay *prior* to learning of her civil rights action. In other words, the harm of which she complains occurred before the event (filing suit) that allegedly caused it.

**24.** Because plaintiff fails to demonstrate her ability to prove her federal claims at trial and the same standards govern her DCHRA claims, she has no case under the DCHRA. Accordingly, any statute of limitations argument is rendered irrelevant.