**Gregory BROOKS, Plaintiff,**

v.

**Michael A. SIEGLER, Defendant.**

**No. 3:06V00331(DJS).**

United States District Court,
D. Connecticut.

Jan. 25, 2008.

John R. Williams, New Haven, CT, for Plaintiff.

James Newhall Tallberg, Karsten, Dorman & Tallberg LLC, West Hartford, CT, John H. Gorman, City of Meriden, Department of Law, Meriden, CT, for Defendant.

### MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

On January 30, 2006, plaintiff Gregory Brooks ("Brooks") brought an action for damages in the Connecticut Superior Court against defendant police officer Michael A. Siegler ("Siegler"), pursuant to Title 42, Section 1983, of the United States Code, claiming violations of his rights under the Fourth Amendment to the United States Constitution. On March 6, 2006, the case was removed to this court. Now pending is Siegler's motion for summary judgment (**dkt.# 21**) pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons that hereafter follow, Siegler's motion for summary judgment (**dkt.# 21**) is **DENIED.**

### I. FACTS

On May 21, 2003 at approximately 10:30 p.m., John Brooks ("John"), the brother of Brooks, called the Meriden Police Department to report that he had been the victim of a theft. Officer Patrick Gaynor ("Gaynor") responded to the call and arrived at 6 Prescott Street in Meriden, the reported

site of the robbery. It was at this location that he found John, allegedly in a state of belligerent intoxication. Because Gaynor believed that John was intoxicated, he would not allow him to remove his van from the scene. John then used his cellular telephone to contact Brooks and request that Brooks provide him with transportation.

Brooks states that he had been contacted by his brother on several occasions for similar requests. Brooks has testified that he knew that his brother had a history of drug problems, and he assumed that on this particular evening, his brother had been caught while making an illegal drug deal. Additionally, Brooks considered Prescott Street to be an area of frequent drug activity.

After John ended the telephone call with Brooks, he allegedly continued to behave erratically. Gaynor called for backup, and Sergeant Manzione ("Manzione") and Siegler were dispatched to the scene. After Manzione and Siegler responded to the call, John allegedly continued his aggressive behavior. Thus, Gaynor arrested him and took him into custody. John apparently was transported to the Meriden Police Department.

After John had been taken away, Siegler, who stayed behind because a tow truck had been called to remove John's van, was the sole remaining officer at the scene. While waiting for the tow truck, Siegler went into his police cruiser and began to complete paperwork related to the incident. It was at this point that Brooks, who had been conversing on his cellular telephone with his girlfriend, Rea Guckin ("Guckin"), during his car ride from Wallingford to Meriden, arrived on the scene.

There are many differences between the parties' versions of the events that followed Brooks' arrival.[1] Brooks apparently pulled his car parallel to the police cruiser, with his driver-side window closest to Siegler's driver-side window. Siegler claims that Brooks' car was "next" to the police cruiser, but Brooks alleges that he parked his car on the side of the street opposite to Siegler's cruiser.

Siegler maintains that, when Brooks arrived, he asked Brooks if he could assist him. Brooks replied that he was there to give a ride to John. Siegler told Brooks that John was no longer at the scene. Brooks replied that he had just spoken with him. Siegler contends that he informed Brooks that his brother had been arrested. Siegler also states that Brooks said that he had heard a police officer speaking rudely to his brother while the two men were conversing on the telephone. Siegler alleges that he told Brooks that he could file a complaint regarding the matter, but that he was unable to assist Brooks with the matter. Siegler also alleges that Brooks next informed him that police officers are frequently being arrested for police brutality and that he pays Siegler's salary. Siegler states that he again instructed Brooks to leave the scene.

Brooks, however, contends that although he was informed by Siegler that his brother was no longer at the scene, he was not ever informed that his brother had been arrested. According to Brooks, after he informed Siegler that he was at the scene to pick up his brother, Siegler replied "Oh, that asshole?" *(see* Brooks Depo. at 43:17–22) and instructed the Brooks to "get the hell out of here" *(see id.* at 45:13–14). Brooks testified that he told Siegler he would leave as soon as he knew where his brother was. Brooks maintains that, be-

---

1. Throughout much of these events, Brooks continued to converse with Guckin on his cellular telephone, apparently relaying to Guckin what was happening.

cause he knew where the Meriden police station was, he would have gone there to pick up his brother if Siegler had told him that was where John was. Brooks alleges that Siegler told Brooks that he did not like his attitude and again requested that Brooks leave the scene. Brooks further alleges that he told Siegler that he did not like Siegler's attitude, and that he would leave when he knew where his brother was.

Siegler contends that he then exited his cruiser, ordered Brooks to leave, and warned Brooks that he would be arrested. According to Siegler, Brooks did not leave, but continued to talk on his cellular telephone. Siegler maintains that he subsequently ordered Brooks out of his vehicle to be placed under arrest for disorderly conduct. According to Brooks, however, as Siegler was exiting his cruiser, he did not order Brooks to leave the scene, but instead ordered Brooks to get out of his car. Brooks also denies that Siegler gave a warning of arrest, but simply said that Brooks was under arrest without giving him a chance to comply. Brooks further states that Siegler never gave him a reason for the arrest.

Siegler contends that he called for police backup during the exchange. Siegler claims that he took into account the possibility that Brooks, or the person on the other end of the telephone call, could let others know that he was having an argument with a solitary police officer, on a street known for its drug trafficking, and that these persons could come to the scene to retaliate. Brooks, however, asserts that Siegler did not call for backup at this point. *(See id. at 54:14–24.)*

There is no dispute that Brooks was still seated and buckled in his vehicle when Siegler approached him. Brooks denies that he "refused" to comply with Siegler's orders or to submit to the arrest. Brooks appears to claim that he was buckled in his vehicle and Siegler did not give him much of a chance to comply. On the other hand, Brooks also has testified that he told Siegler he would exit his vehicle if Siegler would tell him why he was under arrest.

Siegler maintains that next he reached into the car to turn off the ignition and grabbed Brooks' left wrist, but Brooks pulled away, his right hand still holding the cell phone to his ear. After grabbing Brooks' left wrist, Siegler sprayed Brooks with oleoresin capsicum, commonly known as pepper spray. Siegler alleges he used the pepper spray because of his concern that Brooks would drop his cellular telephone and either grab a weapon or use his right fist as a weapon. This enabled Siegler to unbuckle Brooks' seat belt and to remove Brooks from the vehicle.

Brooks, for his part, denies that he pulled away when Siegler grabbed his wrist. Brooks asserts that he did not remove his seat belt at this time because he was holding his cell phone with right hand. Further, Brooks claims that he did not exit the vehicle because he believed that Siegler did not have the right to arrest him.

Upon Brooks' removal from the vehicle, Siegler attempted to lower Brooks to the ground. Brooks, however, did not go down to the ground. Instead, he supported himself on his hands and knees. Siegler ordered Brooks to put his hands behind his back and lower himself to the ground. Brooks did not comply, but instead reached into his front shirt pocket for his inhaler. According to Brooks, he was having an asthma attack due to the pepper spray, and he informed Siegler that he needed his inhaler. Brooks claims that Siegler replied to this statement by telling him that an ambulance would be called later. Conversely, Siegler alleges that Brooks did not inform him that he was having an asthma attack until after the scuffle, when Brooks was being restrained

by a K–9 that arrived at the scene later. Brooks testified that he attempted to use his hands and knees to get back onto his feet because he could not breathe. Siegler then punched Brooks in the face in order to subdue and handcuff him. Siegler maintains that he punched Brooks in the face two times, while Brooks alleges that Siegler punched him more than twice.

Brooks then fell onto his stomach and Siegler handcuffed his left wrist. Brooks again attempted to lift himself from the ground in an effort to get his inhaler. Siegler struck Brooks four more times until he was lowered back onto the ground. Brooks states that after the second punch, he reached into his front shirt pocket, pulled out his inhaler, placed the inhaler to his mouth, and used the medication.

Siegler held Brooks down for approximately ten seconds until Officer Connolly ("Connolly") arrived on the scene with his K–9, Kemo. Siegler then released his hold on Brooks, and the K–9 was instructed to keep the Brooks on the ground. Kemo carried out Connolly's order by jumping and barking, which was enough to cause Brooks to remain silent and to remain still. Siegler contends that it was at this point that Brooks told him that he was having an asthma attack. Although Brooks' left wrist was already handcuffed at this point, there is uncertainty as to when Brooks' right wrist was handcuffed. Siegler contends that he fully handcuffed Brooks after Connolly and Kemo arrived at the scene, while Brooks has testified that, although Siegler's assertion is possible, he does not clearly remember when his right wrist was handcuffed.

Siegler next alleges that he advised dispatch to send an ambulance for Brooks. The parties admit that the emergency vehicles arrived as Connolly was pulling Kemo away. Brooks also asserts that, as the emergency vehicles were heading toward him, he was kicked once or twice by an officer. After Brooks' cellular telephone went dead, Guckin called her mother and told her to go to Prescott Street to see what was happening. Guckin's mother, Kathy Dumont, arrived at the scene and, with Brooks' permission, drove away Brooks' car.

Brooks was transported to Midstate Medical Center in an ambulance. Siegler sat with Brooks while he waited for a doctor to observe him. Siegler maintains Brooks told him that he was going to "get paid" as a result of the incident, and that he did not get out of his vehicle when ordered to do so because Siegler had not told Brooks why he was arresting him. Brooks denies proclaiming to Siegler that he was going to "get paid" as a result of the incident. Brooks then told Siegler that Guckin did not think that he had done anything wrong. Brooks also told Siegler that he did not think it was necessary to use the K–9. Brooks further told Siegler that he did not comply with orders to put his hands behind his back because he is claustrophobic.

Brooks claims that, as a result of his arrest, he suffered an inability to move his jaw for two-and-a-half weeks, which precluded him from talking with his customers.[2] Brooks also suffered from a scraped and bleeding knee; according to Brooks, his left knee constantly "locks up." Brooks further claims that he had to pay hospital expenses due to his injuries, and that he was unable to work for a week. In addition, Brooks has testified that the negative publicity generated by this incident caused a decrease in the amount of his business and customers.

## II. DISCUSSION

 Brooks brings this action pursuant to 42 U.S.C § 1983, alleging violations

---

**2.** Brooks apparently is self-employed, running a lawn and landscaping business.

of his rights under the Fourth Amendment to the United States Constitution. Title 42, Section 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...."

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). "To prevail on a § 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir.1999). Siegler now moves for summary judgment on the complaint, and alternatively raises the affirmative defense of qualified immunity.

## A. STANDARD

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56.

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect

to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. FOURTH AMENDMENT EXCESSIVE FORCE[3]

 The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. "The Fourth Amendment's search and seizure provisions are applicable to [state] defendants through the Fourteenth Amendment's Due Process Clause." *Tenenbaum v. Williams*, 193 F.3d 581, 602 n. 14 (2d Cir.1999) (citing *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961)).

---

**3.** Although Brooks' Complaint alleges that the force used in his arrest was excessive, he does not allege that arrest itself was unlawful.

■ The United States Supreme Court has held that *"all* claims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham,* 490 U.S. at 395, 109 S.Ct. 1865 (emphasis in original). Under *Graham,* "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 396, 109 S.Ct. 1865.

■ Furthermore, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* (citing *Terry v. Ohio,* 392 U.S. 1, 20–22, 88 S.Ct. 1868, 20 L.Ed.2d 889, (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. 1865. While reasonableness is traditionally a question of fact for the jury, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Scott v. Henrich,* 39 F.3d 912, 915 (9th Cir.1994); *see Alexander v. County of L.A.,* 64 F.3d 1315 (9th Cir. 1995). In addition, to prevail on an excessive force claim, a plaintiff must show not only that the amount of force used was objectively unreasonable, but that he suffered some compensable injury as a result. *See Graham,* 490 U.S. at 396, 109 S.Ct. 1865 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, ... violates the Fourth Amendment.") (internal citation omitted); *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir.1996).

The court cannot find as a matter of law that Siegler's use of force against Brooks was objectively reasonable. First, Siegler's and Brooks' accounts of what occurred that night vary in a number of ways, some of which raise genuine issues of material fact precluding summary judgment. For example, there are questions regarding what warning, if any, Siegler gave Brooks before arresting him, and whether Brooks resisted arrest in the way that Siegler alleges (i.e., Siegler claims that Brooks pulled away when Siegler grabbed Brooks' wrist, whereas Brooks claims that he did not). These factual questions preclude the court from determining whether Siegler's use of force, especially the use of pepper spray, was objectively reasonable under the circumstances.

Second, for the purpose of this summary judgment motion, the court must resolve all factual ambiguities in favor of Brooks because he is the nonmovant. Brooks, in essence, contends that: (1) he arrived at the scene to pick up his brother; (2) the brother was no longer at the scene; (3) Siegler (who was in his police cruiser) would not tell Brooks (who was in his car) where the brother was, but instead told Brooks to leave; (4) Brooks told Siegler that he would leave as soon as Siegler informed him where his brother was; (5) Siegler refused to tell Brooks where his brother was and continued to tell Brooks to leave; (6) because Brooks did not leave, Siegler got out of his police cruiser, told him he was under arrest, walked over to Brooks, reached into his car, turned off the ignition, and grabbed Brooks and pepper sprayed him.

In the court's view, the question of whether Siegler's conduct was objectively reasonable under the circumstances cannot be decided on summary judgment because this case contains a number of factual issues that are not clear. To begin with, the appropriateness of Brooks' arrest is uncertain. As the court expressly noted above, Brooks' Complaint does not allege unlawful arrest. Furthermore, even if an arrest were unlawful, there no *per se* rule that any force employed for that arrest is also unlawful; the "reasonableness standard" applies to all excessive force claims. *See Jones v. Parmley*, 465 F.3d 46, 62 (2d Cir.2006). Nevertheless, under the "reasonableness standard," the court still must look at all the facts and circumstances surrounding Siegler's use of force, which includes the arrest itself. Additionally, in his memorandum of law, Siegler himself expressly presents arguments in an attempt to demonstrate that his reasons for the arrest were valid. *(See* dkt. 21, Def.'s Memo., pp. 14–16.) Indeed, Siegler consistently labels the orders he gave Brooks as "legitimate," citing to case law regarding police orders to leave crime scenes, *see Carter v. Jess,* 179 F.Supp.2d 534, 543 (D.Md.2001) or interference with a police officer's duties, *see Herpel v. Joyce,* Civ. No. B:89–669(JAC), 1992 WL 336765 (D.Conn. Sept. 30, 1992).

*Carter* and *Herpel* are distinguishable from this case, though. In *Carter,* the police had recently been involved in a high-speed car chase of an armed suspect that came to an end in the parking lot of a store, a portion of which was cordoned off with yellow police "crime scene" tape. *Carter,* 179 F.Supp.2d at 536. After leaving the store, the plaintiff, who was not watching where he was going, walked alongside the crime scene tape, and admitted that he possibly entered the crime scene. *Id.* at 543. In *Herpel,* the defendant police officers had made a custodial arrest of a car driver for reckless driving, and the vehicle was located near a street intersection, with the nose of the vehicle in the crosswalk. *Herpel,* 1992 WL 336765, at *1–2. The plaintiff, a pedestrian, had entered into the crosswalk and stopped directly in front of the car. *Id.* at *2. When the defendants noticed the plaintiff, they asked him to explain his presence in front of the car; they then ordered him three times to leave the crosswalk. *Id.* Because the plaintiff did not leave, the defendants arrested him for interference with police officers in the performance of their official duties. *Id.* The court found that the plaintiff's conduct constituted "interference" under Connecticut law because "a person could interfere with the performance of an officer's duties merely by refusing to leave an area that the officer was attempting to seal off. The refusal to leave constitutes an interference because it creates a distraction that draws the officer's attention away from his other duties at the scene." *Id.* at *5.

Here, on the other hand, there is no indication that Brooks entered a "crime scene" that Siegler had already, or was attempting to, seal off, or that Brooks ever got out of his car to approach Siegler. Indeed, the opposition is true: Siegler exited his police cruiser and approached Brooks, who was seated in his own car, which, according to Brooks, was located on the opposite side of the street. Thus, the facts of *Carter* and *Herpel* are not apropos to this case. Additionally, it is not clear to the court that Brooks' conduct, by sitting in his car on the opposite side of the street from Siegler and asking allegedly annoying questions while Siegler was filling out paperwork and waiting for the tow truck, constituted "interference" with police duties. In the court's estimation, if the jury members were to accept as true Brooks' version of the events in this case, it is possible they would consider the arrest to be unjustified aggression. This in

turn could affect whether the jury would view as excessive the amount of force used by Siegler to make the arrest.

When looking at the actual force Siegler used against Brooks, the court believes that there are questions as to whether Siegler's conduct was objectively reasonable. Although Brooks did not exit his vehicle per Siegler's order, a reasonable jury could nonetheless find that Brooks was subjected to more force than necessary to secure his arrest, particularly given Brooks' deposition testimony. As the Supreme Court has stated, the proper application of the reasonableness test under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865.

The alleged crime for which Siegler arrested Brooks was of minor severity. There is no indication that Brooks was physically aggressive toward Siegler, or that Brooks was an immediate threat to anybody else in the area. According to Brooks, he was sitting in his car passively, and he did not actively resist or attempt to flee.[4] Thus, no stressful and dangerous condition existed where Siegler was forced into a position where he had to make a split-second judgment of how to deal with the situation. Moreover, there is uncertainty as to whether Siegler ever warned Brooks that he was going to use pepper spray, or the subsequent physical force he employed, before doing so. In the court's view, such circumstances preclude summary judgment in favor of Siegler. *See*

*Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 123–24 (2d Cir.2004) (finding that "allegations ... of force used during the arrest of a nonviolent suspect are sufficient to allow a reasonable factfinder to conclude that the force used was excessive" in a case "where uses of force included lifting and pulling plaintiffs ... by pressing their wrists back against their forearms ...; throwing [a plaintiff] face-down to the ground; dragging [a plaintiff] face-down by his legs, causing a second-degree burn on his chest; placing a knee on [a plaintiff's] neck in order to tighten his handcuffs while he was lying face-down; and ramming [a plaintiff's] head into a wall at a high speed"); *Cruz v. Reilly,* Civil No. 3:05–cv–1524 (CFD), 2007 WL 2815151, at *4 (D.Conn. Sept. 26, 2007) ("A reasonable jury could find that [the plaintiff] was subjected to more force than necessary to secure his arrest, particularly given [his] deposition testimony that [the officers] failed to warn [him] before hitting him with their batons and spraying him with pepper spray."); *Carey v. Maloney,* 480 F.Supp.2d 548, 556 (D.Conn.2007) (holding that fact issues about amount of resistance arrestee offered precluded summary judgment on claim of excessive use of force).

█ The court is also not convinced of Siegler's argument that Brooks suffered no injury from the use of the pepper spray. "Physical force that does not cause severe or lasting injuries can be sufficient to establish excessive force." *Cruz,* 2007 WL 2815151, at *4 (citing *Robison v. Via,* 821 F.2d 913, 923–924 (2d Cir.1987) (finding that allegations that officer pushed plaintiff against the inside of the door of her car, yanked her out, threw her up

---

**4.** By the time Siegler grabbed Brooks and used the pepper spray, he had already taken the keys out of the car's ignition, which precluded Brooks from using the car to flee, or

as a weapon. In addition, Brooks was still belted into his car at the time, which also prevented him from fleeing.

against the fender, and twisted her arm behind her back were sufficient to support excessive force claim); *McLaurin v. Falcone,* No. 04–4849–CV, 2007 WL 247728, at *1 n. 3 (2d Cir. Jan. 25, 2007) (summary order) ("We have made it clear that the injuries suffered need not be permanent or severe to recover under an excessive force claim . . . .")); *see Maxwell v. City of New York,* 380 F.3d 106 (2d Cir.2004). Leaving aside the fact that Brooks alleges injuries not related to the use of the pepper spray, Brooks maintains not only that he experienced the typical effects of pepper spray (such as discomfort in his eyes), but also that he suffered an apparently severe asthma attack. Consequently, insofar as it argues that Brooks suffered no violations of his rights under the Fourth Amendment, Siegler's motion for summary judgment (**dkt.# 21**) is **DENIED.**

## C. QUALIFIED IMMUNITY

"[G]overnment officials performing discretionary functions generally are granted a qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Supreme Court established the analysis for determining whether an officer is entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). "A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201, 121 S.Ct. 2151. "[T]he next, sequential step is to ask whether the right was clearly established." *Id.* "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151.

As the Second Circuit has held, "[w]hen a motion for summary judgment is made in the context of a qualified immunity defense, the question of whether the factual disputes are material is even more critical." *Cartier v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992). Here, the court finds that summary judgment on qualified immunity grounds is inappropriate. There are issues of material fact in this case, in particular the amount and nature of Brooks' resistance to Seigler, that are critical to determining whether Siegler was operating under a reasonable belief as to what level of force he was permitted to employ. *See Thomas,* 165 F.3d at 143 ("Summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness."); *Cruz,* 2007 WL 2815151, at *5. Consequently, insofar as it argues that Siegler is entitled to qualified immunity, Siegler's motion for summary judgment (**dkt.# 21**) is **DENIED.**

## CONCLUSION

For the foregoing reasons, Siegler's motion for summary judgment (**dkt.# 21**) is **DENIED.**